ERWIN LLOYD CURTIS, ADMINISTRATOR AD PROSEQUENDUM
OF THE ESTATE OF RONALD PAUL CURTIS, PLAINTIFF-AP-
PELLANT, v. ROBERT A. FINNERAN, DEFENDANT-RESPON-
DENT.

Argued January 21, 1980—Decided July 22, 1980.

*Lewis P. Dolan, Jr.* argued the cause for appellant (*Dolan & Dolan*, attorneys).

*Albert C. Lisbona* argued the cause for respondent (*Dwyer, Connell & Lisbona*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue on this appeal is whether the judgment of the trial court sitting without a jury is supported by adequate findings of fact to uphold the conclusion that the net pecuniary loss suffered by decedent's two surviving infant sons amounted to a total of $53,394.

The decedent, Ronald Paul Curtis, was killed instantly when the car in which he was a passenger struck a guardrail on a bridge on July 19, 1973. The accident occurred when the defendant, Robert A. Finneran, the owner and operator of the automobile, fell asleep at the wheel. Decedent's father, as the administrator ad prosequendum of the estate of his son, sued Finneran pursuant to the wrongful death statute, *N.J.S.A.* 2A:31-1 *et seq.* The complaint sought reimbursement for funeral expenses and for the net pecuniary loss suffered by decedent's surviving children, Ronald, Jr. and Paul.

At the conclusion of a non jury trial, the court awarded damages of $1,894 for funeral expenses and, without providing findings of fact or reasons, set the amount of the loss suffered by Ronald, Jr. at $23,500 and the loss by Paul at $28,000, for a total of $53,394.

Thereafter the court denied plaintiff's motion for a new trial, but amended the judgment to add counsel fees to the amounts awarded to the children. In the amended judgment, the court awarded $29,375 to Ronald, Jr. and $35,000 to Paul, for a total of $66,269 including funeral expenses.

In an unreported opinion, the Appellate Division reversed the additur of the counsel fee and reinstated the original judgment of $53,394. We granted plaintiff's petition for certification. 81

*N.J.* 354 (1979). We reverse the judgment of the Appellate Division, except for the disallowance of the counsel fee, and remand the matter for trial on damages.

I

The trial centered on the financial loss suffered by the children because of their father's death. Evaluation of that loss requires a summary of the facts of the brief and tragic life of Ronald Paul Curtis. He was born on June 25, 1951, and after graduating from high school in 1969, attended Pennsylvania State University for one month. He served in the National Guard in California for seven months and remained an active member of the Guard until his death. In September, 1970, after returning from California, he began working with the North Eastern Telephone Company as a cable splicer. He also did maintenance work in the evening for the Federal City Manufacturing Company. Curtis took a correspondence course with the International Correspondence School to improve his technical knowledge.

On October 3, 1970, he married and bought a trailer home in Pennsylvania where he and his wife lived. His wife died nine days after the birth of their son, Ronald Paul Curtis, Jr., on October 14, 1972. In March, 1973, Curtis moved to his parents' house. His mother testified that he did about four hours of work a week around their home and that he made weekly contributions of $30 to his mother-in-law who shared the care of Ronald, Jr.

In early 1973, Curtis became engaged and planned to be married in September of that year. Because of his engagement, Curtis planned on relocating and found a job in New Jersey with the Continental Telephone Company as a frameman. He visited his fiancee frequently. She conceived his child some time in June, 1973. The child, Paul, was born on April 12, 1974.

The local manager of Continental Telephone testified that Curtis' starting salary was $3.35 per hour, a wage which reflected his previous work experience with North Eastern. In

addition, Curtis received noncontributory fringe benefits in the form of health, medical, and life insurance. At the time of his death, Curtis was working in a three-month probationary period. The manager testified that, if Curtis had continued with Continental Telephone, his projected earnings would have increased to $5.19 per hour by the time of trial. At the time of trial, Curtis' wages for 1973 totaled $4,235; in 1972, he had earned $7,245.

Plaintiff offered as an expert witness Dr. Matiyahu Marcus, a professor of economics at Rutgers University, to estimate the present economic value of decedent's life to his two children. In general, Dr. Marcus followed methodology accepted by some for estimating the present economic value of the decedent's lifetime to his children. *See* Dennis, *Wrongful Death Damages—Fair Compensation For Future Pecuniary Loss Requires Consideration of Economic Trends and Income Tax Consequences*, 47 *Miss. L.J.* 173, 176 (1976).

In calculating the loss, Dr. Marcus began with decedent's gross income for a base year, the year of the trial, and increased the base year income by 5% as an allowance for fringe benefits. He further increased the base income by the market value of decedent's services around his parents' house. Dr. Marcus did not include pension and retirement benefits in calculating decedent's base income, because the period of economic dependence of the two sons would end before decedent would have retired. Apparently Dr. Marcus did not consider either federal or state income tax liability. His final adjustment in calculating the base income was a deduction for the personal consumption expenses of the decedent if he had lived. Dr. Marcus set that allowance at 20% of base income until 1994, when he estimated the eldest son would attain economic independence, and at 40% from 1994 to 1996, when the youngest son would become economically independent.

He assumed that, because of inflation and increased productivity, the base income as adjusted would be subject to an annual growth rate of 6%. He then arrived at a total figure based on the number of years during which the children could

have expected to receive their father's financial support. This period was assumed to run until the younger child graduated from college. The total figure, net of personal consumption, was discounted to present value by use of a 5.5% discount rate. Since the figure thus calculated was an estimate of future loss only, it was further increased by the base income, relevant fringe benefit amounts, and the estimated value of services from the date of the decedent's death to the time of trial. The sum of these two amounts, $199,048, was the gross amount of the lost income of the decedent and represented, in the expert's view, the net pecuniary loss of the surviving children.[1]

## II

The trial judge considered the expert's testimony too speculative to be a reliable guide in determining the net pecuniary loss to the surviving sons. The judge did not indicate where he differed with the assumptions and inferences of the expert. Furthermore, he recognized that Dr. Marcus had no alternative but to rely on general statistics, rather than specific information.

Without endorsing the testimony of the expert, we conclude that it conforms generally to the expectation that experts will provide the fact finder "with their analyses of trends of future wage increases and discount rates generally . . . ." *Tenore v. Nu Car Carriers*, 67 *N.J.* 466, 483–484 (1975).

We do not suggest that the expert's testimony was invulnerable. For example, the trial court might have had understandable reservations about the assumptions of the expert that (1) the two sons would go to college and remain dependent until age 22 and (2) the personal consumption allowance for the decedent was sufficient. If the children were to attain independence at an earlier age or if the decedent's personal consumption allowance were greater, the award for the children should have been less.

---

[1]The results of Dr. Marcus' calculations may be summarized as follows:

| | |
|---|---|
| lost wages 1973–1975 | 23,493.00 |
| present value wages etc. 1976–1996 | 252,719.00 |
| personal consumption 1973–1975 | 6,273.00 |
| personal consumption 1976–1996 | 70,891.00 |
| Total wages minus total personal consumption | 199,048.00. |

■ In addition, the expert erred in excluding the federal and state taxes Curtis would have been required to pay on earned income if he had lived. The appropriate test is, "plaintiff's recovery must be calculated on the basis of the deceased's net income after taxes giving due regard to the evidence adduced on the deceased's income tax liability." *Tenore, supra,* 67 *N.J.* at 494–495. Furthermore, the award is not subject to taxes and should not be increased "to protect plaintiff from the impact of such taxes." *Id.* at 495; *see Norfolk & W. Ry. Co. v. Liepelt,* 444 *U.S.* 490, 100 *S.Ct.* 755, 62 *L.Ed.2d* 689 (1980); Comment, 29 *Rutgers L. Rev.* 681 (1976).

## III

■ Under the New Jersey wrongful death act, a jury may award "such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical, and funeral expenses incurred for the deceased . . . ." *N.J.S.A.* 2A:31–5. The same principles govern a trial conducted by a court without a jury. The measure of damages is the "deprivation of a reasonable expectation of a pecuniary advantage which would have resulted by a continuance of the life of the deceased." *Carter v. West Jersey & Seashore R.R. Co.,* 76 *N.J.L.* 602, 603 (E. & A. 1908) (quoting *Paulmier, adm'r of Carhart, v. Erie R.R. Co.,* 34 *N.J.L.* 151, 158 (Sup. Ct. 1870)); *Dubil v. Labate, et al.,* 52 *N.J.* 255, 259 (1968); *McStay v. Przychocki,* 7 *N.J.* 456, 460 (1951); *Weiman v. Ippolito,* 129 *N.J.Super.* 578, 586 (App. Div. 1974), mod. 130 *N.J.Super.* 207 (1974). The role of the fact finder is to determine the projected value of the contribution that the decedent would have made to the support of those claiming under the statute. *Capone v. Norton,* 21 *N.J.Super.* 6, 9–10 (App. Div. 1952). All probabilities and every reasonable expectation should be considered. *See Gluckauf v. Pine Lake Beach Club, Inc.,* 78 *N.J.Super.* 8, 21 (App. Div. 1963).

■ In a non jury civil action, the role of the trial court at the conclusion of the trial is to find the facts and state conclusions of law. *R.* 1:7–4. Failure to perform that duty "constitutes a

disservice to the litigants, the attorneys and the appellate court." *Kenwood Assocs. v. Bd. of Adj. Englewood*, 141 *N.J.Super.* 1, 4 (App. Div. 1976). Naked conclusions do not satisfy the purpose of *R.* 1:7–4. Rather, the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions. *See State v. Singletary*, 165 *N.J.Super.* 421, 424–425 (App. Div. 1979), certif. den. 81 *N.J.* 50 (1979); *Kenwood, supra; Wertlake v. Wertlake*, 137 *N.J.Super.* 476, 485–486 (App. Div. 1975). *See generally* Brochin and Sandler, *Appellate Review of Facts in New Jersey, Jury and Non-Jury Cases*, 12 *Rutgers L. Rev.* 482 (1957); Conford, *Findings of Facts and Conclusions of Law*, 92 *N.J.L.J.* 225 (1969).

 The problem on appellate review in this case is that the trial judge did not set forth how he estimated the projected earnings of the decedent. The record reflects that the trial court may have considered this wrongful death action like a support case and that he tacitly decided that the sons were entitled to a weekly allowance based on need. Recovery in a wrongful death action is based on the monetary contributions which the decedent reasonably might have been expected to make to the survivors and is not directly related to their needs. *Dubil, supra*, 52 *N.J.* at 259. However, an increase in a survivor's needs may be used to show that a decedent, within his financial ability, might reasonably be expected to have increased his contribution in light of greater need. *Id.* at n. 1.

In arriving at his own estimate, the trial court committed several mistakes that may have contributed to the amount of the award, which was characterized by the Appellate Division as "modest". For example, he stated that "[t]here was no contribution toward the maintenance and support by the decedent" of the decedent's first son, although decedent's mother gave uncontradicted testimony that decedent had made $30 weekly contributions for the support of his son. In evaluating the expert's estimate of net pecuniary loss, the judge commented that if the amount "were to be in the form of life insurance benefits payable as part of an automobile liability package, insurance package premium, it clearly would have been prohibitive." This

consideration is clearly incorrect. As previously explained, the standard in a wrongful death action is the contribution decedent reasonably would have made to his infant sons, not the cost of insurance premiums for an amount equal to the net pecuniary loss.

■ The trial court allowed the expert to project a gross amount of dollars to establish plaintiff's aggregate damages. That practice would be improper in a case tried before a jury. The reason is that "the projection of a gross figure before the jury submitted by an expert tends to exert an undue psychological impact leading to the danger of its uncritical acceptance by the jury in the place of its own function in evaluating the proofs." *Tenore, supra,* 67 *N.J.* at 482–483. However, in a non jury case, as here, the admissibility of a "bottom line" figure can be left to the discretion of the trial judge. In a non jury case, testimony about a gross dollar amount will be less prejudicial, particularly where the testimony is subject to vigorous cross-examination.

■ Apparently concerned about the adequacy of the award, the trial court granted an additur for counsel fees. However, there is no authority to award counsel fees in a wrongful death action. Under our rules of practice, no fee for legal services shall be allowed except in certain specific instances which do not include wrongful death actions. *R.* 4:42–9; *see Weiman, supra.*

Accordingly, we affirm that part of the judgment of the Appellate Division that disallowed counsel fees and otherwise reverse and remand to the trial court for a new trial as to damages.

*For affirmance in part and for reversal and remandment in part*—Chief Justice WILENTZ, and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*Opposed*—None.