176 N.J. Super. 511 (1980)
424 A.2d 222
IN THE MATTER OF THE COMMITMENT OF ROBERT LEE NEWSOME, APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 7, 1980.
Decided October 31, 1980.
*513 Before Judges FRITZ, POLOW and JOELSON.
Stanley C. Van Ness, Public Advocate, attorney for appellant (Michael L. Perlin, Director, Division of Mental Health Advocacy; Edgar Devine, Assistant Deputy Public Advocate, of counsel and on the brief).
John J. Degnan, Attorney General, attorney for the State (Donald S. Coburn, Essex County Prosecutor, of counsel; Margaret Ann F. Mullins, Assistant Essex County Prosecutor, on the letter brief).
The opinion of the court was delivered by POLOW, J.A.D.
On December 31, 1979, following a commitment review hearing[1] pursuant to State v. Fields, 77 N.J. 282 (1978) the trial judge ordered that defendant "remain committed to the civil section of Trenton Psychiatric Hospital." Defendant's application for a new trial was denied on January 30, 1980 for the following reasons:
1. That Robert Lee Newsome continues to suffer from psychosis and organic brain damage;

*514 2. That he constitutes a danger to himself and to society; and
3. That the interests of society, as well as the interests of the defendant can best be served by in-patient supervision at the Trenton Psychiatric Hospital (civil section).
We are thus called upon to determine whether the broad discretionary authority of the trial judge was mistakenly exercised in ordering continued commitment of appellant who had been previously acquitted of criminal charges by reason of insanity. Recognizing the extremely narrow scope of appellate review and according the trial judge's determination the utmost deference, we nevertheless conclude that the record fails to supply a legitimate justification for continuance of prevailing restraints on the liberty of committee-appellant. Hence, we reverse and remand for further proceedings as indicated below.
When he was approximately 19 years of age, in May 1975, appellant Robert Lee Newsome, was the victim of a brutal mugging whereby he sustained severe head injuries. He was ultimately transferred from East Orange General Hospital to the Essex County Hospital Center and diagnosed as suffering from diffuse encephalopathy. In January 1976 he was discharged to his mother's care. In June 1977 he was indicted for carnal abuse and impairing the morals of a minor. It is conceded that he engaged in a voluntary and consensual sexual relationship with his 12 year old "girlfriend."
At a competency hearing, the court found that appellant suffered marked intellectual impairment and memory deficiency for recent and remote events. In addition, Newsome had a history of psychotic symptoms and suffered from chronic brain syndrome with psychosis and mental retardation. The trial judge concluded that defendant was unable to appreciate that his sexual behavior with a 12 year old child was wrong. Hence, appellant was acquitted by reason of insanity and transferred from the Essex County Jail to the Essex County Hospital Center, a psychiatric facility.
*515 Krol[2] hearings were conducted periodically and as of May 1, 1978, an order was entered for appellant's conditional discharge from the Essex County Hospital Center to an out-patient residential treatment program known as Project Right-On, operated by the Mount Carmel Guild in Newark. Although he eventually left the program in violation of the court's order, he did return on occasion to collect his mail and "see how things are going." He lived with members of his family and there is no evidence of any incident or problems involving appellant during the several months following his leaving the Right-On project until he was committed to Trenton Psychiatric Hospital on execution of a bench warrant issued by the court in November 1979.
At a hearing on December 20, 1979 two psychiatrists offered their opinions that Newsome was not dangerous to himself or others. Both concluded that there was no need for continued hospitalization although appellant continued to suffer from chronic organic brain syndrome and functioned at a mildly retarded level. He required medication to control a convulsive disorder resulting from his head injuries.
Both doctors were of the opinion that his mother could provide the committee with suitable structure and supervision, especially that necessary to insure his receiving regular medication.
Although counsel for the State agreed with the applicant that continued hospitalization was no longer necessary, by order of December 31, 1979 the court directed continued commitment to the civil section of Trenton Psychiatric Hospital. On this appeal, the State concedes that "in light of all of the information presently available with respect to appellant's condition, his continuing in-patient status is no longer required."
*516 After the United States Supreme Court announced that the standard of involuntary commitment must "bear some reasonable relation to the purpose for which the individual is committed," Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972), the New Jersey statutory provision, N.J.S.A. 2A:163-3, was held unconstitutional because it permitted continued commitment of individuals suffering from slight mental illness. State v. Krol, 68 N.J. 236, 246-247 (1975). Nevertheless, the ultimate issue of "dangerousness," although it involves medical considerations, is a legal question for decision by the judge.
[W]hile courts in determining dangerousness should take full advantage of expert testimony presented by the State and by defendant, the decision is not one that can be left wholly to the technical expertise of the psychiatrists and psychologists. The determination of dangerousness involves a delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. [Id. at 261]
Once the degrees of mental illness and "dangerousness" are determined, the judge is required to formulate an appropriate order providing for the least restrictive restraints found to be consistent with the safety of the community and the individual.
The object of the order is to impose that degree of restraint upon defendant necessary to reduce the risk of danger which he poses to an acceptable level. Doubts must be resolved in favor of protecting the public, but the court should not, by its order, infringe upon defendant's liberty or autonomy any more than appears reasonably necessary to accomplish this goal. [Id. at 261-262]
Such an order is subject to modification if the defendant has become more or less dangerous than he was previously, or it may be terminated upon a determination that the defendant is no longer mentally ill or dangerous at all. Id. at 263.
The Krol standards were further refined in Fields. The Fields court determined that a defendant acquitted by reason of insanity has the same right to periodic review as a civil committee. Fields, supra, 77 N.J. at 294. It was further noted that the burden of proof is imposed upon the State of justify continued restrictions. Id. at 299-300.

*517 The burden should not be placed on the civilly committed patient to justify his right to liberty. Freedom from involuntary confinement for those who have committed no crime is the natural state of individuals in this country. The burden must be placed on the state to prove the necessity of stripping the citizen of one of his most fundamental rights, and the risk of error must rest on the state. Since the state has no greater right to confine a patient after the validity of the original commitment has expired than it does to commit him in the first place, the state must bear the burden of proving the necessity of recommitment, just as it bears the burden of proving the necessity for commitment. [Id. at 300, citing Fasulo v. Arafeh, 173 Conn. 473, 378 A.2d 553, 557 (Sup.Ct. 1977).]
A recent United States Supreme Court decision has increased the burden imposed upon the state. In Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) the court, in the context of a civil commitment proceeding, held,
To meet due process demands, the standard has to inform the factfinder that the proof must be greater than the preponderance of the evidence standard applicable to other categories of civil cases.
We noted earlier that the trial court employed the standard of `clear, unequivocal and convincing' evidence in appellant's commitment hearing before a jury. That instruction was constitutionally adequate. [Id. at 432-433, 99 S.Ct. at 1806].
More recently, we ordered a rehearing for application of the "clear and convincing evidence" standard rather than the "preponderance of the evidence" test previously applied. In re Scelfo, 170 N.J. Super. 394, 397 (App.Div. 1979).
The trial judge's conclusion that Newsome still constituted a danger to himself and to society and "that his behavior clearly indicated that he should not be released or the restraints in any way removed" was substantially based upon his concern about potential ill effects should appellant fail to take his medication regularly. There was no evidence that Newsome ever committed violent acts or demonstrated violent tendencies. His antisocial sexual behavior in 1977 involved no use of force. Although he was found at that time to be incapable of understanding "the age of consent" concept, there was evidence that he now understands it is wrong. Furthermore, during the four months residency with his family before the bench warrant was executed in November 1979, there is no evidence of misbehavior or offense of any kind on Newsome's part. There is no factual *518 support based upon past actions of the patient and no medical prognosis based upon his present condition to justify a finding of likelihood of dangerous conduct which either society or appellant must be guarded against. In re Matter of R.B., 158 N.J. Super. 542, 546 (App.Div. 1978). Hence, we must conclude that the trial judge's findings were so clearly erroneous "and so plainly unwarranted that the interests of justice demand intervention and correction." State v. Johnson, 42 N.J. 146, 162 (1964).
Although we must reverse, a further plenary hearing will be required. Hence, we cannot comply with the Public Advocate's request that we exercise original jurisdiction to establish conditions of release. The policy enunciated in State v. Maik, 60 N.J. 203, 218 (1972), that an offender is not "restored to reason" sufficient to justify release "unless he is so freed of the underlying illness that his `reason' can be expected to prevail," has been superseded by the concept of "conditional release."
The value of conditional release as a therapeutic measure is to be considered against the background of the Legislature's intent to provide `humane care and treatment.' Surely there is a point reached where a patient can no longer benefit from confinement in the artificial and protected environment afforded by a mental institution. Perhaps even more compelling is the harm which could occur to patients confined in institutions when contact with the outside world would stimulate them to recovery or prevent deterioration into more harmful states. [State v. Carter, 64 N.J. 382, 395 (1974) (footnote omitted)].
In formulating an appropriate order for conditional release, the trial judge must bear in mind the need for gradual relaxation of restraints.
It cannot be emphasized too strongly that the relaxation of the restraints on the committee's liberty must proceed in gradual stages. As the level of dangerousness posed by the committee decreases, he should be afforded the opportunity to demonstrate his ability to cope responsibly with the stresses of normal everyday life with diminishing degrees of supervision. Only after the committee has progressed to the point where he has proven that he can function in normal society with minimal supervision should consideration be given to unconditional release. This process of gradual de-escalation will substantially minimize the risk of erroneous determinations of non-dangerousness and will thus protect the State's compelling interest in maintaining the safety and security of its citizens. [State v. Fields, 77 N.J. at 303].
*519 We conclude, therefore, that the trial judge is in the best position to determine appropriate conditions, to obtain such additional information as may be necessary by way of testimony and medical reports, to determine what out-patient treatment may be required, to ascertain what facilities are available for such treatment and to impose appropriate requirements for supervision and review. A plenary hearing to establish release conditions shall be conducted within thirty days hereof.
Reversed and remanded.
FRITZ, P.J.A.D. (concurring).
In the circumstances of this case, I am satisfied of the correctness of the result achieved by the majority. My inability to join with certain of their determinations and my deep-seated concern for a potential problem in the area invoke this concurring opinion.
At the outset I record my unqualified agreement with the statement of the law in this area as it is articulately detailed by Judge Polow. I am certain, as well, that the trial judge was correctly informed in this respect and that he endeavored to apply that law to the facts. I concur in his comment in his oral opinion:
It is the burden of the State on a hearing such as this to, by a clear and convincing evidence, to demonstrate that the defendant remains a danger to himself and society. The determination of dangerousness involves the prediction of the defendant's future conduct rather than mere characterization of past conduct, although that is evidential as to probable future conduct. This determination, while requiring the Court to make use of the medical testimony furnished by both sides, in the final analysis the decision is a legal one and not a medical one. All doubts are to be resolved in favor of the public. Psychiatric opinion is no more conclusive on the dangerousness of a person who has been committed than his evidence manifested by actual potential harmful behavior. The final decision, as I said, is for the Court and not the psychiatrist.
I concur as well with my brethren that the record provides no support at all for the finding that "[t]he man is psychotic." The *520 evidence elicited from two testifying psychiatrists[1] seems wholly to the contrary. That he was previously psychotic seems undeniable. The record provides no evidence at all to suspect that condition prevails presently.
On the other hand, I cannot share the conviction of the majority that there "is no factual support based upon past actions of the patient and no medical prognosis based upon his present condition to justify a finding of likelihood of dangerous conduct which either society or appellant must be guarded against."
As far as past actions go, appellant departed without leave from a structured program which assured a medication regime both testifying doctors find vital to his well being and rational conduct. Without regard for the mentality here which, understandably perhaps, disregards orders of the court, I share the concern of the trial judge for the mentality here which does not realize (or understand) the absolute essentiality of the medication.
With respect to the prognosis, unlike the majority I also share the awareness of the trial judge that the favorable diagnoses and prognoses of both physicians were emphatically bottomed on the hypothesis that appellant would continue to take his medicine, a state of affairs which the treating psychiatrist, Dr. Remo, testified she suspected not to have prevailed while appellant was absent without leave. In his findings the trial judge emphasized his regard for the opinions of the doctors defining the necessity for continued medication and for the condition with respect thereto which they imposed on their favorable prognoses. He recognized that their belief that appellant was not presently a danger to himself or others was predicated on the fact that appellant was taking his medicine. These findings respecting *521 the expert opinions cannot be said to lack record support. When Dr. Remo was asked what might happen if appellant stopped taking his medication, she replied, "Well, I feel it might be  there is a stress factor involved, he might be susceptible to it and react otherwise." The qualifications she imposed on her response to a question as to the circumstances which might cause appellant to become dangerous are even more telling:
Well, if circumstances prevail he was exposed to, for instance, any altercations, probably on the outside, and he's not taking any medication and he could be provoked by circumstances that prevails at the time, he could be susceptible in his emotion or impulses. He might not be able to control these, if he was not taking medication. However, if he would continue to take medication, perhaps his impulses could be controlled or tranquilizers it could be more amicably controlled, this behavior.
Candidly favoring discharge, Dr. Simring frankly stated that "[i]n terms of his medical condition, if he did not keep medical treatment ... I think he would be facing the problem of what to do once again."
The trial judge found therefrom (1) that appellant's condition of being not a danger to himself or others obtains "at this time" because he is compelled to take his medication by virtue of his hospitalization and (2) that his unauthorized departure from a court-ordered structured program and the experience thereafter at his mother's, both with regard to the medication and her lack of understanding of the situation, compelled a guarded forecast. I think these findings are not only reasonably supported by the record, but inescapable in the light of the expert testimony from both sides. In such circumstance we must not interfere, at least with respect to the findings. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474 (1974).
In my view it is extremely important, especially in this most sensitive field, that we do not permit hard facts to blind us to the wisdom (indeed, the mandate) of Rova, supra, and its predecessors in the field of deference to the trial judge, such as Dolson v. Anastasia, 55 N.J. 2, 7 (1969) and State v. Johnson, 42 N.J. 146 (1964). See also Mayflower Securities v. Bureau of Securities, 64 N.J. 85 (1973), DeAngelo v. Alsan Masons, Inc., 122 *522 N.J. Super. 88 (App.Div. 1973), aff'd o.b. 62 N.J. 581 (1973) and Parkview Village Asso. v. Bor. of Collingswood, 62 N.J. 21 (1972). Indeed, there is a direction that we should not undertake our own fact-finding jurisdiction (and presumably this also in the circumstance of declaring nonproof of facts; see Kaplowitz v. K & R Appliances, Inc., 108 N.J. Super. 54, 61-62 (App.Div. 1969), certif. den. 55 N.J. 452 (1970)) except "sparingly and in none but a clear case where there is no doubt about the matter." Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App.Div. 1960), aff'd o.b. majority opin., 33 N.J. 78 (1960).
This case is clearly one of hard facts. Apparently appellant is retarded through no fault of his own nor even as a matter of genetics: he suffered severe brain damage from a mugging. In such circumstance sexual activity with a consenting "girl friend" who also happened to be below the statutory age of consent does not take on the opprobrium of a rape or of the seduction of a child. The activity simply does not generate anger or inspire the revenge of punishment. Rather, almost irresistibly it invokes sympathy and a desire to help.
I respectfully suggest that it is this humanity and kindness, always commendable attributes, that mislead the majority. They find that there is no record evidence of likelihood of dangerous conduct which either society or appellant must be guarded against. They omit the condition necessary to invest that statement with accuracy: so long as defendant faithfully complies with a prescribed medication regimen.[2] It is this perfectly natural reaction (which I recognize because I had my *523 own struggle with it) which evokes that described above as my deep-seated concern for a potential problem.
Unless in these cases particularly, by the determined deference to the trial judge traditionally promised and accorded him, Dolson, supra, 55 N.J. at 7, we acknowledge his superior ability to latch on to a responsible "feel" for the case and to measure the demeanor of the witness, thereby not only assessing credibility but also measuring the innuendo of the testimony, we risk a dangerous, albeit perhaps unintentional, surrender of the function of the judiciary. No one here contests  nor could anyone successfully contest  that in New Jersey at least the determination respecting release is ultimately a legal one to be made not by doctors, or even the agreement of all counsel, but by the judge. This is not only his privilege but his obligation. State v. Krol, 68 N.J. 236, 261 (1975). Neither he nor we may delegate this function or abandon it. But unless on review we leave some room for play in the joints of the machine, we may well be turning over this decisional process to the medical profession or even to the executive branch. If the integrity of findings must rest on bases in literal expression derived from a printed transcript, we have told the State and the doctors that they may compel the result. I think such an effect offends both the letter and the spirit of our present law. As is specifically emphasized in Krol, supra, at 261,
... [W]hile courts ... should take full advantage of expert testimony presented by the State and by defendant, the decision is not one that can be left wholly to the technical expertise of the psychiatrists and psychologists. The determination of dangerousness involves a delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy.
Accordingly, I would defer to the findings of the judge and the entirely reasonable inferences he has drawn therefrom, except for that finding respecting appellant's psychotic nature. I am wholly satisfied he did not at all indulge in the "complete disregard of expert testimony absent any basis for disagreement" interdicted in State v. Carter, 64 N.J. 382, 406 (1974). Rather, he quite properly analyzed and evaluated the testimony.
*524 Irrespective of this, I am convinced that the ultimate determination of the trial judge was needlessly restrictive, even with an assumption of the findings made by him (less, of course, that concerning appellant's purportedly psychotic nature), and agree with the majority that to that extent he went wide of the mark. I am satisfied that a reasonably structured medication regimen would satisfy present needs. Therefore I join the majority in its intention to remand for the purposes set forth in the conclusion of its opinion.
NOTES
[1] The hearing was precipitated by the execution of a bench warrant issued when defendant violated conditions of a previous order. It was, nevertheless, dealt with by the court as a commitment review hearing.
[2] State v. Krol, 68 N.J. 236 (1975).
[1] Because neither the court nor counsel had "any problem" with the qualifications of Dr. Simring, they do not appear in this record. That his specialty is in psychiatry seems beyond question.
[2] I have intentionally not beclouded that which I think is a fairly clear measurement of the findings against the record by reference to such things as the fact that uncontroverted expert opinion in the case also spoke to the necessity for "follow-up care" including psychiatric treatment. Nor have I referred to the fact, possibly significant, that even when in the structured environment and medicating, appellant "never recognized his means to fit to the demands of the boarding home" and "would be a pest sometimes, a nuisance to the staff and to neighbors."