712 A.2d 1277 (1998)
313 N.J. Super. 449
In the Matter of the COMMITMENT OF D.M.
Superior Court of New Jersey, Appellate Division.
Argued June 10, 1998.
Decided July 2, 1998.
*1278 Robert S. Seguin, Milltown, for appellant D.M.
Susan Gleason, Elizabeth, for respondent State of New Jersey (Thomas V. Manahan, Union County Prosecutor, attorney; Maureen O'Brien, Assistant Prosecutor, of counsel and on the brief).
Lorraine M. Gormley, Deputy Public Advocate, as amicus curiae for the Division of Mental Health and Guardianship Advocacy (Ivelisse Torres, Public Defender, attorney; Ms. Gormley, of counsel and on the brief).
Judith Nason, Deputy Attorney General, amicus curiae for the State of New Jersey, Department of Law and Public Safety (Peter Verniero, Attorney General, attorney).
Before Judges BAIME, BROCHIN and WEFING.
The opinion of the court was delivered by BAIME, P.J.A.D.
D.M. appeals from the Law Division's order involuntarily committing him to the Trenton Psychiatric Hospital. We reverse the order and remand the matter for an evidentiary hearing which is to be conducted forthwith.

I.
D.M. pled guilty to an accusation charging him with sexually assaulting his sister (N.J.S.A. 2C:14-2b). The paltry record submitted to us is not entirely clear respecting the circumstances surrounding the offense. Apparently the victim was twelve years of age and D.M. was at least four years older at the time the offense was committed. It appears that the errant sexual behavior consisted of touching the victim in inappropriate places. Although the act was repeated several times, no penetration occurred. At the time the offense was committed, D.M. was engaged in a long term sexual relationship with his other sister who was two years younger than he. D.M.'s parents had previously discovered D.M.'s aberrant sexual behavior and had removed him from the family residence to live with his grandmother. However, they subsequently permitted D.M. to return and he quickly reverted to having sexual intercourse with one sister and sexual contact with the other.
Following entry of his guilty plea, D.M. was sentenced to the Adult Diagnostic Treatment Center (ADTC). Although the sketchy record is devoid of details, D.M. made little progress while incarcerated at the ADTC. His sentence expired on January 23, 1998. Because of his poor adjustment and the treating psychologists' prognosis of potential *1279 recidivism, D.M. was involuntarily committed to the Forensic Psychiatric Hospital for a period of twenty days.
On February 19, 1998, the Law Division conducted a hearing to determine whether D.M. suffered from a mental disease and whether he posed a danger to himself or others. Dr. Elter Ghahramani, a staff psychiatrist at the Forensic Psychiatric Hospital, testified on behalf of the prosecutor. Much of his testimony related to whether D.M. suffered from pedophilia, the diagnosis that had been given by the treating psychologists at the ADTC. Although Dr. Ghahramani's testimony on the subject was less than enlightening, he disputed the ADTC's diagnosis because the formal psychiatric condition of pedophilia apparently required more than mere touching for sexual gratification. Although it was undisputed that D.M. had engaged in consensual sexual intercourse with the older of his two sisters, she was less than four years younger than D.M., and thus the aberrant relationship between the two siblings did not meet the formal definition of pedophilia.
While Dr. Ghahramani confessed to "having difficulty giving a psychiatric diagnosis," he concluded that D.M.'s condition did not meet the statutory commitment criteria. However, Dr. Ghahramani testified D.M.'s "history" indicated that if a "potential victim [were] available," D.M. would "have a difficult time ... control[ling] himself" because of his "impulsivity." The doctor opined further that "if [D.M.] returned to the same environment with the same level of supervision," he would present "a high risk to re-offend." Dr. Ghahramani recommended that D.M. be transferred to Trenton Psychiatric Hospital for a period of sixty days so that his interaction with female patients could be observed and evaluated.
At the conclusion of Dr. Ghahramani's testimony, the Law Division judge announced his decision to commit D.M. to Trenton Psychiatric Hospital for thirty days. D.M.'s attorney protested the judge's decision, noting that he wished to present witnesses, including D.M.'s next of kin, who were then in court, in order to rebut Dr. Ghahramani's opinion and recommendation. The judge rejected the attorney's proffer, stating that he had "already made up [his] mind."

II.
We reverse the Law Division's order. Our reasons are several.
First, the Law Division's refusal to permit D.M. to present witnesses contravened the most elementary requirements of procedural due process. Because involuntary commitment effects a great restraint on individual liberty, "this power of the State is constitutionally bounded." In re S.L., 94 N.J. 128, 137, 462 A.2d 1252 (1983); see also Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 1786, 118 L.Ed.2d 437, 448 (1992) (holding that the states must prove by clear and convincing evidence that the person to be committed is mentally ill and dangerous). "`The civil commitment process must be narrowly circumscribed because of the extraordinary degree of state control it exerts over a citizen's autonomy.'" In re D.C., 146 N.J. 31, 48, 679 A.2d 634 (1996) (quoting In re S.L., 94 N.J. at 139, 462 A.2d 1252); In re N.N., 146 N.J. 112, 130, 679 A.2d 1174 (1996). Thus, a person subject to involuntary commitment "is entitled to a judicial hearing, a right of notice, the right to present evidence, and the right to be represented by counsel." In re D.C., 146 N.J. at 48, 679 A.2d 634. Moreover, while it may be within the trial court's discretion to refuse to hear testimony from the patient's next of kin, see N.J.S.A. 30:4-27.13(c), the statutory provision does not bar relevant testimony. Here, D.M. was denied the fundamental right to present evidence in his behalf, and was thus deprived of procedural due process.
Second, the Law Division judge did not articulate his reasons in ordering D.M.'s commitment. In a nonjury civil action, the role of the trial court is to find the facts and state conclusions of law. R. 1:7-4. "Naked conclusions do not satisfy the purpose of R. 1:7-4." Curtis v. Finneran, 83 N.J. 563, 570, 417 A.2d 15 (1980). Instead, the trial court is obliged to "state clearly its factual findings and correlate them with the relevant legal conclusions." Ibid. Our Supreme Court has said that "[f]ailure to perform that duty `constitutes *1280 a disservice to the litigants, the attorneys and the appellate court.'" Ibid. (quoting Kenwood Assocs. v. Board of Adj. of Englewood, 141 N.J.Super. 1, 4, 357 A.2d 55 (App.Div.1976)); see also State v. Singletary, 165 N.J.Super. 421, 424-25, 398 A.2d 576 (App.Div.), certif. denied, 81 N.J. 50, 404 A.2d 1150 (1979), Wertlake v. Wertlake, 137 N.J.Super. 476, 485-86, 349 A.2d 552 (App. Div.1975); Brochin and Sandler, Appellate Review of Facts in New Jersey, Jury and Non-Jury Cases, 12 Rutgers L.Rev. 482 (1957). In this case, we are left with a cryptic commitment order unsupported by any factual findings or conclusions of law. The matter must be returned to the Law Division.

III.
Because the issue must be retried, we are constrained to comment on Dr. Ghahramani's testimony. As we noted earlier, although Dr. Ghahramani had difficulty providing a diagnosis, he concluded D.M.'s condition did not meet the requisite statutory commitment criteria. In their appellate briefs, the parties and the Public Defender's Division of Mental Health and Guardianship Advocacy have devoted much attention to whether D.M.'s psychological state may be considered a "mental disease" sufficient to warrant involuntary commitment upon a finding of dangerousness. Because the present record is largely uninformative respecting that question, we have no occasion to resolve the issue.
As a matter of due process, the term "mental illness" is devoid of any "talismanic significance," and legal definitions may "vary substantially from their psychiatric counterparts." Kansas v. Hendricks, 521 U.S. ___, ___, 117 S.Ct. 2072, 2080, 138 L.Ed.2d 501, 513 (1997). The Constitution affords the states substantial discretion in defining the phrase "mental disease" and "mental illness," and the definitions so drafted "need not mirror those advanced by the medical profession." Id. at ___, 117 S.Ct. at 2081, 138 L.Ed.2d at 514.
Against this backdrop, our statutes define "in need of involuntary commitment" in the following terms:
[A]n adult who is mentally ill, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to be admitted to a facility voluntarily for care, and who needs care at a short-term care, psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the person's mental health care needs.

[N.J.S.A. 30:4-27.2m.]
The phrase "mental illness" is defined as:
[A] current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior or capacity to recognize reality, but does not include simple alcohol intoxication, transitory reaction to drug ingestion, organic brain syndrome or developmental disability unless it results in the severity of impairment described herein. The term mental illness is not limited to "psychosis" or "active psychosis," but shall include all conditions that result in the severity of impairment described herein.

[N.J.S.A. 30:4-27.2r.]
By adopting these definitions, the Legislature clearly intended to balance the rights of the mentally ill with those of our citizens who are not so afflicted. See also R. 4:74-7. However phrased, the statutory definition requires, as a prerequisite to involuntary commitment, that the person to be committed harbor a "substantial disturbance of thought, mood, perception or orientation" significantly impairing the individual's "judgment, capacity to control behavior or capacity to recognize reality," N.J.S.A. 30:4-27.2r, which causes him to be "dangerous to [him]self or dangerous to others or property," N.J.S.A. 30:4-27.2m. The statutes further require consideration of whether the person's "mental health care needs" and the danger presented by the underlying illness can be alleviated by means short of involuntary commitment.
Unfortunately, Dr. Ghahramani did not focus upon a functional analysis of D.M.'s condition within the context of these statutory definitions. While the doctor made oblique references to D.M.'s "impulsivity" and *1281 the patient's inability to control his behavior, he was primarily concerned with arcane psychiatric nomenclature unanchored to the critical inquiry demanded by our statutes. We do not suggest that medical definitions are never useful in determining whether the statutory requisites for involuntary commitment are satisfied. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders xiii, xxvii (4th ed.1994). But medical terminology cannot substitute for the standards plainly articulated in the relevant statutes. Regarding Dr. Ghahramani's opinion that D.M.'s condition did not meet the commitment criteria, we note that the determination of whether an individual is legally committable, "while requiring the court to make use of the assistance which medical testimony may provide, is ultimately a legal one, not a medical one." State v. Krol, 68 N.J. 236, 261, 344 A.2d 289 (1975); see also In re D.C., 146 N.J. at 59, 679 A.2d 634; In re Newsome, 176 N.J.Super. 511, 516, 424 A.2d 222 (App.Div.1980).

IV.
We add one further thought before leaving the subject. Apparently, the parties to this dispute consented to staying all review proceedings pending the outcome of this appeal. We cannot fathom the reasons for such a stay.
Accordingly, the Law Division's order of involuntary commitment is reversed. The matter is remanded for an evidentiary hearing forthwith.