# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE
## APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3230-19

IN THE MATTER OF THE
CIVIL COMMITMENT OF
R.H.

_____

Argued October 18, 2021 – Decided November 15, 2021

Before Judges Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. CACC-000468-20.

Lorraine Gormley-Devine, Assistant Deputy Public Defender, argued the cause for appellant R.H. (Joseph E. Krakora, Public Defender, attorney; Lorraine Gormley-Devine, of counsel and on the briefs; Patrick J. Hurst, Assistant Deputy Public Defender, on the briefs).

Regina M. Philipps argued the cause for respondent Burlington County Office of the Adjuster (Madden & Madden, PA, attorneys; Regina M. Philipps and David E. Madden, on the brief).

PER CURIAM

R.H.[1] appeals from an April 17, 2020 order continuing her involuntary civil commitment to the Hampton Behavioral Health Center (Hampton). Based on our review of the record, we are convinced the court abused its discretion by ordering the continuation of R.H.'s civil commitment. We therefore reverse.

I.

On April 8, 2020, R.H. was involuntarily committed to Hampton pursuant to N.J.S.A. 30:4-27.10(b). Nine days later, on April 17, 2020, a municipal court judge conducted a hearing on the Burlington County Office of the Adjuster's (County) request for continuation of R.H.'s commitment. R.H. appeared at the hearing with counsel.[2] The County presented the testimony of R.H.'s treating physician, Dr. Atta-Ur Rehman, and R.H. testified on her own behalf.

Dr. Rehman explained R.H. has no history of treatment by a psychiatrist in the community, or of prior psychiatric hospitalizations. R.H. has a family history of schizophrenia; her father has schizophrenia.

R.H. was admitted to Hampton on April 8, 2020, because she was "delusional, paranoid, [and] agitated," was receiving messages from her

---

[1] We use initials to identify the appellant because records of civil commitment proceedings are excluded from public access under Rule 1:38-3(f)(2).

[2] The hearing was conducted virtually.

deceased mother, and "was unable to care for herself or function." According to Dr. Rehman, R.H. was upset with her husband because she believed he was "trying to take the property" previously owned by her mother. Dr. Rehman acknowledged he did not have actual knowledge whether R.H.'s claim concerning her husband's attempt to take the property was true. Dr. Rehman noted R.H.'s family members reported there was "a change in [R.H.'s] behavior completely," R.H.'s father has schizophrenia, and "[t]hey all think . . . [R.H.] has [had] a schizophrenic break."

Dr. Rehman diagnosed R.H. with "psychotic disorder not . . . specified," and a secondary diagnosis for cannabis abuse.[3] R.H. was prescribed Zyprexa for the psychotic disorder. Dr. Rehman testified R.H. initially resisted taking the medication, but started taking it a "couple of days," or perhaps "three days," before the April 17, 2020 hearing. Dr. Rehman further explained it was too early to determine if the medication "reached an optimal level or dosage" because R.H. "remain[ed] delusional and paranoid," R.H. "still believes that her husband is manipulating everybody," and R.H. "has no place to go."

---

[3] Dr. Rehman acknowledged R.H. used marijuana lawfully pursuant to a prescription for medical marijuana for pain management related to injuries she suffered in a disabling car accident. Dr. Rehman did not explain the nature or extent of the cannabis disorder or rely on it to support his recommendation for the continuation of R.H.'s involuntary commitment.

Dr. Rehman testified R.H. reported that "everybody is abusing her," she is the victim of domestic violence by her husband, and she intended to "go back to her oldest son" and live with him. Dr. Rehman further explained R.H. refused to provide her oldest son's contact information. Dr. Rehman testified R.H. told a nurse practitioner at Hampton "she [is] only taking medication because she wants to be discharged." Dr. Rehman also opined R.H. could not be "treated in a less restrictive setting."

Dr. Rehman testified R.H. would be "a danger to herself, others or property" if she was released to a less restrictive setting. The doctor opined R.H. "was destructive with property" at home, explaining R.H. had thrown her husband's phone at their home. In support of this opinion, Dr. Rehman referred to a "record indicat[ing] that [R.H.] had broken her husband's cell phone because she was mad." Dr. Rehman agreed, however, that the reported incident concerning the phone involved a fight between R.H. and her husband during which R.H. threw her husband's phone but did not assault her husband in any manner.

When asked if R.H. currently posed a danger to herself, Dr. Rehman stated:

> Because of her current delusion and paranoia[,] I think she <u>could</u> be because if we will discharge her[,] we

4

don't know what [she would] do because [she] ha[s] no place to go, we don't know where she would go from here, and because of her psychosis.

[(Emphasis added).]

Dr. Rehman acknowledged, however, he had no information that R.H. had ever taken any action to harm herself, or that, prior to her admission, she neglected her need for food or shelter.

Dr. Rehman testified that when R.H. is discharged from Hampton, she will be referred to a psychiatrist in the community who will be charged with monitoring and prescribing R.H.'s medications. Dr. Rehman recommended the continuation of R.H.'s involuntary commitment with a "two-week review" based on his hope she would show improvement and a placement for her could be located.

As noted, R.H. also testified. She admitted having difficulties in her marriage. She denied throwing her husband's phone. She testified that during an argument with her husband, she "tried to grab the phone." She also testified "the phone is not broken" and her husband "still uses it."

R.H. explained she had been a nurse, but was receiving disability benefits for lower back, shoulder, and neck injuries she suffered "through" work. She

5 A-3230-19

saw a pain management specialist for the injuries, and "recently had ablations done on [her] back."

R.H. testified that prior to her involuntary commitment she bought food and prepared meals for her and her husband. R.H. said she had trouble sleeping, but she got "enough" sleep. She often tried sleeping on the couch at home and was fearful of her husband unless her son was at home. R.H. testified she would follow up with a psychiatrist in the community if released and would take any medications prescribed by a psychiatrist in the community.

R.H. also testified she did not like the way the medication prescribed by Dr. Rehman made her feel. R.H. was, however, amenable to a conditional release requiring that she "follow up with a psychiatrist" and "take the medication that is prescribed."

R.H. did not agree with Dr. Rehman's diagnosis that she suffered from psychosis. She disagreed with her diagnosis of mental illness, claiming instead she was "emotionally and physically abused by [her] husband." R.H. further stated her husband has a history of domestic abuse and she had sought a restraining order against her husband approximately two weeks before her commitment. R.H.'s description of how she sought the restraining order against her husband is vague. She testified "[she] tried going to [her] local police

department but with [her husband] being a [local public official, she] didn't get much help there with the police department."

R.H. also testified she filed a complaint with the "[g]rievance [d]epartment" at Hampton alleging other patients were receiving improper treatment. Specifically, R.H. claimed doctors at the facility did not respond to patients' complaints regarding their prescribed medications.

R.H. testified that, if released from commitment, she would like to either return to her marital home — if her husband was removed from the home — or move in with her adult son. R.H. testified her adult son indicated there was a place for her in his home.

Based on that record, the municipal court judge issued a terse oral opinion, concluding R.H.'s involuntary commitment should be continued "with a two-week review." The judge's findings supporting his determination consist of the following:

> [R.H.] was admitted to the facility with -- with delusions. This is her first hospitalization we're advised and there's indication of a family history in regard[] to the mental illness. Upon cross-examination it appears that at least for eight years the – [R.H.] has had some interaction with psychiatric healthcare providers. There appears to be chronic pain issues. And from her own testimony, in the course of the Worker's Comp[ensation] injury that gave rise to her disability, in her own words there has been consultation

7 <span>A-3230-19</span>

with those with psychiatric treatment credentials. It does appear there are in fact chronic pain issues. I can appreciate the fact that her profession was that of a nurse, it appears though that she does -- she's related what has transpired over approximately eight years, <u>it does appear to the [c]ourt that she does not recognize that she does in fact have a mental illness. I'm further satisfied that with this non-recognition that she is a danger to self. There does appear to be, at least in her mind, indications of domestic violence. I find it most telling that she indicates that she could go live with the son and yet she has denied the medical staff access to that individual to see if there is a place for her to stay. I'm satisfied at this time until the medications reach their proper level that she cannot be freed in a less restrictive setting,</u> accordingly [her commitment is continued] with a two[-]week review.

[(Emphasis added).]

The judge entered an April 17, 2020 order continuing R.H.'s involuntary commitment. R.H. appealed from the order. R.H. was released from Hampton on April 28, 2020. The County moved to dismiss the appeal as moot, and this court denied the motion.

## II.

We first summarize the well-established legal principles that guide our review of an order continuing an involuntary commitment following a temporary commitment. "[T]he involuntary commitment of an individual 'is a profound and dramatic curtailment of a person's liberty and as such requires meticulous

adherence to statutory and constitutional criteria.'" In re Commitment of D.M., 285 N.J. Super. 481, 486 (App. Div. 1995) (quoting Fair Oaks Hosp. v. Pocrass, 266 N.J. Super. 140, 149 (Law Div. 1993)). To continue an individual's involuntary commitment after a temporary commitment order, a court must find "by clear and convincing evidence presented at [a] hearing that the patient is in need of continued involuntary commitment to treatment." R. 4:74-7(f)(1).

To establish a patient's need for continued involuntary commitment, the State must present clear and convincing evidence that

> (1) the patient is mentally ill[;] (2) mental illness causes the patient to be dangerous to self or dangerous to others or property as defined in N.J.S.A. 30:4-27.2(h) and -.2(i)[;] (3) the patient is unwilling to be admitted to a facility for voluntary care or accept appropriate treatment voluntarily[;] and (4) the patient needs outpatient treatment as defined by N.J.S.A. 30:4-27.2(h) or inpatient care at a short-term care or psychiatric facility or special psychiatric hospital because other less restrictive alternative services are not appropriate or available to meet the patient's mental health care needs.
>
> [R. 4:74-7(f)(1); see also N.J.S.A. 30:4-27.2(m).]

A "mental illness" under Rule 4:74-7(f)(1) is defined as "a current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior or capacity to

9

recognize reality." N.J.S.A. 30:4-27.2(r). A person is deemed "[d]angerous to

self" if

> by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm or death will result within the reasonably foreseeable future.
>
> [N.J.S.A. 30:4-27.2(h).]

Whether an individual is dangerous to self within the meaning of N.J.S.A.

30:4-27.2(h) is a legal issue requiring that the "judge . . . make specific findings

and correlate them to the legal standards" while guided by medical expert

testimony. In re Commitment of M.M., 384 N.J. Super. 313, 337-38 (App. Div.

2006) (citing In re D.M., 313 N.J. Super. 449, 454, 456 (App. Div. 1998)).

Medical labels are not determinative of the existence of a qualifying mental

illness or an individual's dangerousness; a functional analysis of the patient's

condition under "the standards plainly articulated in the relevant statutes" is

required. D.M., 313 N.J. Super. at 456. The statutory definitions require a legal

judgment guided by medical expert testimony. In re D.C., 146 N.J. 31, 59

(1996); D.M., 313 N.J. Super. at 456.

"The evidence must permit the judge 'to come to a clear conviction [that person is mentally ill and dangerous], without hesitancy.'" M.M., 384 N.J. Super. at 334 (alteration in original) (quoting In re G.G.N., 372 N.J. Super. 42, 59 (App. Div. 2004)). The evidence must be "so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." In re Commitment of Robert S., 263 N.J. Super. 307, 312 (App. Div. 1992) (alteration in original) (quoting In re Jobes, 108 N.J. 394, 407-08 (1987)).

To support an order continuing a civil commitment, a court must make specific findings and correlate them to the legal standards. D.M., 313 N.J. Super. at 454. The court "shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury[.]" R. 1:7-4(a). The court must state the facts forming the basis of its decision, and then weigh and evaluate those facts under the governing law "to reach whatever conclusion may logically flow from" those facts, Slutsky v. Slutsky, 451 N.J. Super. 332, 357 (App. Div. 2017), because justice requires that "[a]ll conclusions must be supported." Ibid.

We review a decision continuing an individual's civil commitment for an abuse of discretion. See D.C., 146 N.J. at 58-59. "[W]e afford deference to the

trial court's supportable findings," In re Commitment of T.J., 401 N.J. Super. 111, 119 (App. Div. 2008), and "reverse[ ] only when there is clear error or mistake." M.M., 384 N.J. Super. at 334. However, we "must consider the adequacy of the evidence." Ibid.

On appeal, R.H. argues the court erred by ordering the continuation of her involuntary commitment because the County did not present clear and convincing evidence she posed an imminent danger to self under N.J.S.A. 30:4-27.2(h), or a danger to others or property under N.J.S.A. 30:4-27.2(i). She also argues the court erred by relying on her lack of insight concerning her mental illness and need for further stabilization as a basis for its continuation order. R.H. also claims the court erred because any issues related to R.H.'s need for shelter could have been satisfied through release with services available in the community. See N.J.S.A. 30:27.15(a) (requiring consideration of "the least restrictive environment for the patient to receive clinically appropriate treatment" in determining whether to continue an involuntary civil commitment).

We first observe the court failed to make the requisite findings of fact supporting its determination that continuing R.H.'s involuntary civil

commitment was required because she was a danger to self.[4] See R. 1:7-4. Other than vaguely referring to R.H.'s history of chronic back pain, and her "family history of mental illness," the court's findings are comprised of nothing more than its observations that R.H. does not recognize she has a mental illness, she appears "in her mind" to have "indications" of domestic violence, and she said she would live with her son if released but would not give Hampton staff contact information for her son. It was on those sparse findings alone that the court determined R.H. was a danger to self and that she could not be released under any set of less restrictive circumstances.

We find the court's findings inadequate. The court did not make any credibility determinations even though R.H. denied Dr. Rehman's assertions, based on what he was told by others, that R.H. threw her husband's phone and R.H. conjured up the story about her husband's effort to take property that had belonged to her mother. The court also did not make any factual findings related to the elements necessary to support the continuation of an involuntary commitment under N.J.S.A. 30:4-27.2(m) and R. 4:74-7(f)(1). See Curtis v.

---

[4] The court did not find continuation of R.H.'s civil commitment was required because R.H. presented a danger to others or property under N.J.S.A. 30:4-27.2(i). The County does not argue the court erred by not finding R.H. was a danger to others or property. It is therefore unnecessary to address R.H.'s claim the court erred by continuing her involuntary commitment on that basis.

Finneran, 83 N.J. 563, 570 (1980) (explaining a trial court must "state clearly its factual findings and correlate them with the relevant legal conclusions").

For example, the court did not make a finding R.H. suffered from a mental illness or identify the mental illness it determined warranted her continued civil commitment, even though those findings are essential to a determination the commitment should be continued. See N.J.S.A. 30:4-27.2(m) and R. 4:74-7(f)(1). Similarly, the court did not make a finding as to causation; that is, the court did not make findings as to whether R.H.'s mental illness caused her to be dangerous to self. Again, such a finding is a prerequisite to the continuation of an involuntary civil commitment under N.J.S.A. 30:4-27.2(m) and R. 4:74-7(1)(2), because the County is required to prove such causation by clear and convincing evidence to justify the continued involuntary commitment of a patient. R. 4:74-7(f)(1).

The lack of requisite findings did not end there. The court did not make any findings supporting its determination R.H. posed a danger to self, other than its oblique, conclusory determination that her "non-recognition of her mental illness" satisfied the court "she is a danger to self." The court added that there "appears" to be "at least in [R.H.'s] mind, indications of domestic violence" but the court does not make any findings as to whether there was domestic violence

as R.H. testified there was, or there was no domestic violence based on Dr. Rehman's vague testimony about what he heard from others. Last, the court noted R.H.'s reported statements and testimony she would live with her son if released, and Dr. Rehman's testimony R.H. would not provide contact information for her son, as an apparent basis for its finding R.H. was a danger to self. But the court does not explain how her failure to provide the contact information rendered her a danger to self under the N.J.S.A. 30:4-27.2(h) standard.

What is also missing from the court's analysis are findings addressing the legal standard for dangerous to self under N.J.S.A. 30:4-27.2(h). See D.M., 313 N.J. Super. at 456 (reversing an order continuing an involuntary civil commitment because the testifying treating physician did not "focus upon a functional analysis of [the patient's] condition within the context of the[] statutory definitions" in N.J.S.A. 30:4-27.2).

To satisfy its burden of proving R.H. was a danger to self, the County was required to clearly and convincingly establish that "by reason of" R.H.'s mental illness she threatened or attempted suicide or behaved in a manner that indicates she is unable to satisfy her need for nourishment, medical care or shelter, "and it is resultantly probable that substantial bodily injury, serious physical harm or

15

death will result within the reasonably foreseeable future." N.J.S.A. 30:4-27.2(h). The court, however, made no findings addressed to this essential element of the County's proofs. In its failure to make such findings, the court did not honor its obligation to cull through the evidence presented, make factual determinations based on the evidence it deemed credible, and correlate those determinations to the applicable legal standards in support of an order grounded in competent evidence and the law. See Curtis, 83 N.J. at 570; D.M., 313 N.J. Super. at 454. As we have explained,

> [t]he importance of the individual and public interests implicated by civil commitment "demonstrate the particular necessity . . . for the trial judge to comply assiduously with the mandate of . . . [the] myriad [of] cases pointing out the importance of findings." In re Commitment of S.D., 212 N.J. Super. 211, 218-19 (App. Div. 1986). A judge presiding over a commitment hearing is vested with extraordinary responsibility; when the judge does not apply the legal standards and find the relevant facts, our subsequent correction of the abuse of discretion is a poor remedy for the ill.
>
> [M.M., 384 N.J. Super. at 332-33 (alterations in original).]

Here, the dearth of proper and complete findings would otherwise require a remand for further findings by the court, see, e.g., D.M., 313 N.J. Super. at 454, but a remand is unnecessary because R.H. has been released and we are

16

otherwise convinced the County failed to present clear and convincing evidence R.H. was a danger to self under the statutory standard in N.J.S.A. 30:4-27.2(h).

Most simply stated, the County failed to present evidence that by reason of a mental illness R.H. threatened or attempted suicide or otherwise behaved in a manner indicating an inability to satisfy her need for shelter "so that it is probable that substantial bodily injury, serious physical harm, or death will result in the reasonably foreseeable future." N.J.S.A. 30:4-27.2(h). The best the County could muster in support of its claim R.H. was a danger to self is Dr. Rehman's testimony that R.H. "could" be a danger to self if released.

Dr. Rehman's testimony does not constitute clear and convincing evidence R.H. was a danger to self under N.J.S.A. 30:4-27.2(h) for two reasons. First, Dr. Rehman did not testify R.H. was a danger to self under the statutory standard. Dr. Rehman's testimony R.H. could be a danger to self if released was made without reference to the statutory standard, without correlating any facts pertaining to R.H. under the standard, and without any functional analysis under the statute. See D.M., 313 N.J. Super. at 456. For example, Dr. Rehman did not testify that if released, it was probable R.H. would suffer the injuries or death in the reasonably foreseeable future as required to establish dangerousness to self under N.J.S.A. 30:4-27.2(h).

17

Second, Dr. Rehman's testimony is insufficient to satisfy the dangerous-to-self standard because she opined only that R.H. "could" be a danger to self if released. That is not enough. The County was required to present clear and convincing evidence it was "probable" R.H. would suffer the defined injuries or death within a reasonably foreseeable time after her release. See N.J.S.A. 30:4-27.2(h); R. 4:74-7(f)(1). Evidence R.H. "could" be a danger to herself allows nothing more than a conclusion it is possible R.H. was danger to self. See Could, Merriam-Webster, https://www.merriam-webster.com/dictionary/could (last visited Oct. 29, 2021) (defining "could" as "past tense of can"); see Can, Merriam-Webster, https://www.merriam-webster.com/dictionary/can (last visited Oct. 29, 2021) (defining "can" as "used to indicate possibility" and "sometimes used interchangeably with may"); see May, Merriam-Webster, https://www.merriamwester.com/dictionary/may (last visited Oct. 29, 2021) (defining "may" as "used to indicate possibility"). N.J.S.A. 30:4-27.2(h) requires evidence establishing a probability of the injuries supporting a finding of dangerous to self, and the County offered no evidence, and certainly not clear and convincing evidence, permitting such a finding as to R.H.

We are not persuaded by the County's claim the evidence established R.H. was dangerous to self under N.J.S.A. 30:4-27.2(h) because she suffered from a

18

mental illness and did not have a place to stay if released. The County's argument finds no support in the evidence, and, in fact, is undermined by the evidence.

Dr. Rehman was fully aware of the circumstances surrounding R.H.'s mental illness, including her alleged psychosis, delusions, and paranoia; R.H.'s refusal to provide contact information for the son with whom she said she would live if released; and all the other circumstances pertaining to R.H.'s civil commitment. Dr. Rehman, however, opined only that R.H.'s release "could" result in a danger to self for R.H. if the involuntary commitment was not continued. Again, the record lacked any evidence that, given all the circumstances the County now argues supported R.H.'s continued commitment, it was probable R.H. would suffer the consequences required to render her dangerous to self under the statute N.J.S.A. 30:4-27.2(h). The County's only witness, Dr. Rehman, did not offer testimony permitting a finding R.H. was dangerous to self under the statute. See T.J., 401 N.J. Super. at 119 (explaining an order continuing a civil commitment must clearly and convincingly establish that the danger the patient poses constitutes "a substantial risk of dangerous conduct within the reasonably foreseeable future") (quoting In re S.L., 94 N.J. 128, 138 (1983)).

Because the County failed to present sufficient competent evidence establishing R.H. was dangerous to self, see N.J.S.A. 30:4-27.2(h), the court abused its discretion by finding the County satisfied its burden of demonstrating an entitlement to the continuation of R.H.'s involuntary commitment under N.J.S.A. 30:4-27.2(m).  See U.S. Bank Nat. Ass'n v. Guillaume, 209 N.J. 449, 467-68 (2012) (explaining a court abuses its discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis'" (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007))).  "[W]e have not hesitated to reverse involuntary commitments when the record failed to contain clear and convincing evidence of 'a substantial risk of dangerous conduct within the reasonably foreseeable future,'" T.J., 401 N.J. Super. at 119 (quoting S.L., 94 N.J. at 139), and are compelled to do so again here based on the record presented.  That conclusion renders it unnecessary to address R.H.'s remaining arguments.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3230-19