803 A.2d 166 (2002)
353 N.J. Super. 450
In the Matter of the CIVIL COMMITMENT OF E.D.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 2002.
Decided August 2, 2002.
*167 Joan D. Van Pelt, Assistant Deputy Public Defender, argued the cause for appellant E.D. (Peter A. Garcia, Acting Public Defender, attorney; Brian J. Neff, Assistant Deputy Public Defender, on the brief).
Mary Beth Wood, Deputy Attorney General, argued the cause for respondent State of New Jersey (Peter C. Harvey, Acting Attorney General of New Jersey, *168 attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Ms. Wood, on the brief).
Before Judges KING and WINKELSTEIN.
PER CURIAM.
These are combined appeals from several judgments under the New Jersey Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38, involving the commitment of E.D. to the Special Offenders Unit at the Northern Regional Unit (NRU) in Kearny. Following a commitment hearing at which testimony from experts for both sides was presented, Judge Freedman found on February 14, 2001 that E.D. posed a threat to the community because he suffered from antisocial personality disorder and polysubstance abuse which, in combination, made him a sexually violent predator. E.D. was committed to the NRU. Fourteen months later, after E.D.'s annual review hearing, Judge Perretti found on April 19, 2002 that E.D. no longer qualified as a sexually violent predator under the SVPA and ordered his unconditional discharge. We affirm the appeals from each commitment hearing, with modification of Judge Perretti's order discharging appellant unconditionally.
[We do not publish I through V of our opinion because the guidelines for publication are not met. R.1:36-2(d).]

VI
We turn to the State's argument that the trial court's failure to impose conditions upon E.D.'s discharge constituted a mistaken exercise of discretion. According to N.J.S.A. 30:4-27.32(a), if the court finds by "clear and convincing evidence that the person needs continued involuntary commitment as a sexually violent predator, it shall" continue his involuntary commitment. However, "[i]f the court finds that the person is not a sexually violent predator, the court shall so order." N.J.S.A. 30:4-27.32(b).
The subject of a conditional discharge is raised in N.J.S.A. 30:4-27.32(c)(1), which notes, in part, that
[i]f the Department of Human Services recommends conditional discharge of the person and the court finds that the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment as a sexually violent predator unnecessary for that person,
the judge may then order the person be conditionally discharged in accordance with a discharge plan. The statute does not contain language which allows the judge to impose conditions upon discharge once a person is determined by the court to no longer be a sexually violent predator. In this respect, the SVPA does not mirror the statute which was upheld in Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), which expressly gives the trier of fact the right to conditionally release a committee. See Kan. Stat. Ann., §§ 59-29(a)(8) and 59-29(a)(18).
Given the statutory language of the SVPA, the State does not argue that the act provides the authority for the hearing judge to order a conditional discharge. Rather, the State submits that the right to conditionally discharge a person who has been committed under the SVPA is an inherent power of the court. We agree.
In State v. Carter, 64 N.J. 382, 386, 316 A.2d 449 (1974), overruled on other grounds by State v. Krol, 68 N.J. 236, 344 A.2d 289 (1975), the Court considered the propriety of a conditional release for *169 "those adjudicated insane both at the time of the commission of an offense and at trial, necessitating commitment" to a State hospital. At that time, insane persons were committed pursuant to N.J.S.A. 2A:163-2, which provided, in part, that they were to be confined "until such time as [they] may be restored to reason ...." Id. at 390, 316 A.2d 449. The statute did not provide for conditional release. Concluding that the court had the inherent authority to conditionally discharge a person so committed, Justice Pashman, speaking for the Court, looked to the fundamental purpose of the legislation, the "protection of the innocent from injury." Id. at 391, 316 A.2d 449. He stated:
The fact that the Legislature has acted to provide a remedy does not mean that the judicial branch is limited to the boundary lines of strict legislative expression in fashioning or denying remedies in a particular case .... Contemporary judicial decisions announcing a new rule of law `are the product, not only of re-evaluation of abstract principles of justice but also practical considerations....'
If there is a distinction between the court's authority to provide for probation in the criminal context and an analogous release system as to those adjudicated insane, this Court fails to discern it. The courts have the power to fashion psychiatric out-patient probation in the form of conditional releases.
[Id. at 392-93, 316 A.2d 449 (internal citations and footnote omitted).]
In Carter, the patient's "underlying or latent personality disorder" was incurable, but in a state of remission. The Court found that a person with "such a mental state" should be "subject to supervisory and clinical control for the protection of society." Id. at 394, 316 A.2d 449. On the other hand, the Court recognized that "[w]hen a patient is in a state of remission and there are sufficient medical assurances that he will not pose a threat to the public safety if at large, prolonged confinement can serve no therapeutic purpose." Ibid. To reconcile these competing policies, "the protection of society ... as well as the patient's rights," the Court authorized "[c]onditional releases accompanied by judicial and psychiatric supervision" to be "utilized under appropriate circumstances." Id. at 397, 400, 316 A.2d 449.
The Court's decision in State v. Fields, 77 N.J. 282, 390 A.2d 574 (1978), also provides guidance. In Fields, the Court first acknowledged that a person may only continue to be committed (after being acquitted of criminal charges by reason of insanity) so long as the "potential for... harm remains sufficiently great so that his confinement would be warranted were his initial commitability at issue." Id. at 295, 390 A.2d 574. The Court emphasized that the State's power to "continue restrictions on the liberty of a committee terminates when his condition no longer satisfies the legal standards for their initial imposition." Id. at 296, 390 A.2d 574. It said: "[t]he authority of the state to impose restraints on a committee's liberty is thus contingent upon the continuance of the justification therefor as measured by that individual's present mental condition and degree of dangerousness." Ibid. In other words, the Court recognized that once the legal standard for commitment no longer exists, the committee is subject to release.
The Court then reaffirmed the principles established in Carter, that the person's release, even when the legal standard for commitment is no longer met, must proceed in gradual stages.
[E]ven when the committee's condition shows marked improvement, only the most extraordinary case would justify modification in any manner other than *170 by a gradual de-escalation of the restraints upon the committee's liberty. For example, where the State is unable to justify the continuance of an order for restrictive confinement, the outright release of the committee[ ] into the community without the use of any intermediate levels of restraint, see State v. Carter, 64 N.J. 382, 403-404, 316 A.2d 449 (1974), would normally constitute a manifestly mistaken exercise of the reviewing court's discretion.
It cannot be emphasized too strongly that the relaxation of the restraints on the committee's liberty must proceed in gradual stages. As the level of dangerousness posed by the committee[] decreases, he should be afforded the opportunity to demonstrate his ability to cope responsibly with the stresses of normal everyday life with diminishing degrees of supervision. Only after the committee has progressed to the point where he has proven that he can function in normal society with minimal supervision should consideration be given to unconditional release. This process of gradual de-escalation will substantially minimize the risk of erroneous determinations of non-dangerousness and will thus protect the State's compelling interest in maintaining the safety and security of its citizens.
[State v. Fields, 77 N.J. at 303, 390 A.2d 574.]
We are convinced that the same rationale applies to commitment under the SVPA. In enacting the SVPA, the Legislature recognized that under the existing involuntary commitment statutes, persons were subject to commitment only if they were mentally ill, while other individuals who suffered from mental abnormalities or personality disorders which did not qualify as a mental illness under the general civil commitment legislation, presented a similar, if not greater, danger to society. N.J.S.A. 30:4-27.25(a) and (b). The Legislature therefore found it necessary to modify the involuntary civil commitment process to recognize the need to commit those sexually violent predators who were not mentally ill as defined by the general commitment statute, but who nevertheless "pose a danger to others should they be returned to society." N.J.S.A. 30:4-27.25(c). Said another way, the intent of the Legislature in enacting the SVPA was to broaden the reach of New Jersey law to afford protection to society from those sexually violent predators who pose a danger as a result of a mental abnormality or personality disorder which makes them likely to engage in repeated acts of predatory sexual violence. In a situation where the State is unable to justify the continued confinement of the committee based on the progress the committee has made during his period of confinement, we believe this legislative intent is best effectuated by releasing the committee subject to intermediate levels of restraint.
"Above all" courts must seek to "effectuate the fundamental purpose for which the legislation was enacted." State, Twp. of Pennsauken v. Schad, 160 N.J. 156, 170, 733 A.2d 1159 (1999) (citation omitted). Here, although the SVPA says that when the committee is no longer found to be a sexually violent predator he should be released, the statute does not state that the release must be without conditions. In arriving at our conclusion, we are convinced that the spirit of the SVPA prevails over its general terms, see Dvorkin v. Township of Dover, 29 N.J. 303, 315, 148 A.2d 793 (1959), and that the Legislature intended this approach over the unrestricted release of a SVPA committee, which would be "at odds with the sense of the situation." Roman v. Sharper, *171 53 N.J. 338, 340-41, 250 A.2d 745 (1969).
To allow a person who has been committed as a sexually violent predator to be released without conditions may, in certain circumstances, place the safety and security of the public at risk. This risk of harm to society may be reduced by the person's mandatory compliance with conditions upon release. For example, if a committee is found no longer "likely to engage in acts of sexual violence" as long as he continues to take medication, it would be folly to release him into the general populace without conditioning his release upon compliance with a required course of medication.
E.D. submits that had the Legislature desired to allow for conditional releases, it could have done so. Since much of the language of the SVPA has been modeled after Kansas' sexually violent predator statute, and since the Legislature did not include language in the SVPA similar to that portion of the Kansas statute which provides for conditional releases, E.D. argues that the Legislature did not intend to allow for conditional releases. We do not find this argument persuasive.
We may "presume that the Legislature is familiar with existing judicial statutory interpretations." Chase Manhattan Bank v. Josephson, 135 N.J. 209, 227, 638 A.2d 1301 (1994) (citations omitted). It follows that at the time the SVPA was enacted in 1998, see L. 1998, c. 71 (effective August 12, 1999), the Legislature was aware of the Supreme Court's decisions in Carter and Fields. Rather than intentionally omitting the provision for conditional discharge from the SVPA, we conclude that the Legislature probably did not consider that such a provision was necessary under existing New Jersey law as expressed in those cases.
E.D. further argues that our unpublished decisions in In re Commitment of S.R., No. A-923-00 (App.Div. February 6, 2000), and In re Commitment of R.W., No. A-1230-00 (App.Div. January 30, 2002), limit the alternatives to release when the term of commitment is completed. Such a reading of these cases is too narrow. S.R. and R.W. are distinguishable. In both cases we were presented with the question of whether the court has the authority to order that a sexually violent predator be placed in a facility less restrictive than the NRU. S.R. at 28-32; R.W. at 12-15. Relying on the language of N.J.S.A. 30:4-27.32(a), which requires that sexually violent predators be housed in a "facility designated for [their] custody, care and treatment" by the Department of Corrections, we found that the trial judge had no authority to place the offenders in a less restrictive facility. See also N.J.S.A. 30:4-27.25(d). Our rulings were predicated upon public safety considerations. S.R. at 31-32. In S.R. we said: "In our view the legislature has decided ... in the interest of public safety, that the appropriate environment for a committee under the SVPA is a designated secure custodial facility operated by the Department of Corrections." Id. at 32 (citing N.J.S.A. 30:4-27.34(a) (emphasis added); see also R.W. at 20 (finding that public safety considerations support the security requirement of having all committees under the SVPA housed in approved facilities). Here, just as in S.R. and R.W., public safety considerations underpin our decision to allow the hearing judge to impose conditions on a person previously confined under the SVPA upon that person's discharge.
Having determined that the hearing court has the inherent authority to impose conditions, the next question is whether conditions are warranted upon E.D.'s discharge. In this case, the hearing judge did not consider conditions because she did not believe she had the authority *172 to do so. Since we have found otherwise, a remand is appropriate. The hearing judge is in the best position to determine what conditions, if any, should be placed upon E.D.'s discharge. See In re Commitment of Newsome, 176 N.J.Super. 511, 519, 424 A.2d 222 (App.Div.1980). On remand the judge in her discretion, may take additional testimony and accept such additional evidence as may be necessary to effectuate this purpose.
Affirmed in part and remanded in part.