839 A.2d 922 (2004)
365 N.J. Super. 486
I/M/O the COMMITMENT OF JJF.
Superior Court of New Jersey, Appellate Division.
Argued November 6, 2003.
Decided January 13, 2004.
*923 Stanley Shur, Assistant Deputy Public Defender, argued the cause for appellant JJF (Yvonne Smith Segars, Public Defender of New Jersey, attorney; Mr. Shur, on the brief).
Mary Beth Wood, Deputy Attorney General, argued the cause for respondent State of New Jersey (Peter C. Harvey, Attorney General of New Jersey, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. Wood and Dina Mikulka, Deputy Attorney General, on the brief).
Appellant filed a pro se supplemental brief.
Before Judges KING, LINTNER and LISA.
The opinion of the court was delivered by KING, P.J.A.D.
These three appeals, A-6175-01T2 (Appeal-1), A-2744-02T2 (Appeal-2), and A-3946-02T2 (Appeal-3), concern the involuntary civil commitment of JJF under the New Jersey Sexually Violent Predators Act (SVPA). JJF challenges his continued commitment as a sexually violent predator. We affirm, but remand in part for consideration of a conditional discharge if supporting proofs are presented at the next scheduled commitment hearing.

I
In 1999 the Legislature adopted the Sexually Violent Predators Act (SVPA), codified at N.J.S.A. 30:4-27.24 to 30:4-27.38. Through the SVPA the Legislature sought to "modify the involuntary civil commitment process in recognition of the need for commitment of those sexually violent predators who pose a danger to others should they be returned to society." N.J.S.A. 30:4-27.25c. The SVPA defines "sexually violent predator" as
a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.
[N.J.S.A. 30:4-27.26.]
When it appears a person may meet the criteria of a sexually violent predator, the agency with jurisdiction, usually Corrections or Human Services, gives written notice to the Attorney General ninety days, or as soon as practicable, prior to the anticipated release from confinement. N.J.S.A. 30:4-27.27. A judge will then hold a hearing to determine whether the person should be committed. If the court finds by clear and convincing evidence that the person needs involuntary commitment as a sexually violent predator, the court shall issue an order authorizing the involuntary commitment to a facility designated for the *924 custody, care and treatment of sexually violent predators. N.J.S.A. 30:4-27.32. Once a person is committed, he receives an annual review hearing, under N.J.S.A. 30:4-27.35, twelve months from the date of the first hearing and annually afterwards. N.J.S.A. 30:4-27.36 gives the person's treatment team authority to recommend the person's release before the annual review hearing if "the person's mental condition has so changed that the person is not likely to engage in acts of sexual violence if released."
If the court finds that the person is not a sexually violent predator, the person is discharged or returned to complete his term of incarceration. N.J.S.A. 30:4-27.32. If discharged, N.J.S.A. 30:-27.32c(1) specifically authorizes a judge to order a conditional discharge if the Department of Human Services so recommends and "the court finds that the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment as a sexually violent predator unnecessary for that person."

II
For nearly two years, JJF, now age sixty-eight, has been committed under the SVPA at the Special Treatment Unit (STU) at Kearny, Hudson County. The Attorney General petitioned for involuntary commitment in late 2001 as JJF approached the end of a prison term for various sex offenses against children.
The sex offenses that gave rise to JJF's civil commitment began in 1985. On October 7, 1985 JJF pled guilty to criminal sexual contact with a boy, age thirteen, and aggravated sexual assault against another boy, age eleven. Dr. Peter Leavitt, Ph.D., the principal clinical psychologist at the Adult Diagnostic and Treatment Center at Avenel, reported in late 1985:
The instant offense[s] consisted of [JJF] touching a 13-year old boy on his thighs, buttocks and penis on three occasions, and his fondling and putting the penis of an 11 year old boy in his mouth. This occurred from May 1, 1985 to August 15, 1985.[JJF] initially stated that he attempted to touch the 13 year old boy's genitals once or twice and attempted to perform fellatio with the 11 year old, but that the boy pushed his head away. The mothers of both boys have indicated that the incidents have had a bad effect on the boys and their families.
JJF was sentenced to twenty years in state prison in 1985. He was paroled on January 7, 1992.
After his January 1992 release JJF lived in a side-by-side residential duplex in Elmwood Park, Bergen County. The other occupants were a married couple and their two sons, DL, age three, and DAL, an infant. On November 16, 1993 JJF was again arrested and charged with sexual assault, five counts of endangering the welfare of a child and four counts of lewdness.
The events leading to the 1993 arrest include one occasion in August 1993 when DL's father was unloading his car. After the father left DL unattended with JJF, DL ran to his father screaming that JJF just showed him his "pee-pee." On a different occasion, another neighbor testified that in October 1993, his son, age seven, came into the family home "jumpy." The neighbor went into the backyard and saw JJF leave his apartment naked. JJF's landlord also testified she saw JJF standing naked facing the neighbor's fence while the neighbor's children were playing in the yard.
*925 In April 1995 a jury found JJF guilty of endangering the welfare of a child and lewdness for the October 1993 events. In 1998, we affirmed these convictions. He was acquitted of charges stemming from the August 1993 incident. JJF's scheduled release date from prison was December 7, 2001.
Meanwhile, JJF was convicted in December 1994 (prior to the April 1995 trial) of two counts of criminal sexual contact arising out of the touching of two boys in a bowling alley. He was sentenced to probation on these charges.
On November 28, 2001 the Attorney General filed a petition for civil commitment under N.J.S.A. 30:4-27.28. The final hearing began on April 16, 2002. The hearing continued for a second day on June 11, 2002. Judge Freedman conducted the proceedings at the Northern Regional Unit at Kearny. The Attorney General presented as witnesses psychiatrist Dr. Stanley Kern, M.D. and psychologist Dr. Jeffrey C. Singer, Ph.D. JJF alone testified against his commitment.
Dr. Kern thought JJF was more likely than not to sexually reoffend in the foreseeable future unless confined. Dr. Kern diagnosed JJF with pedophilia. He based his opinions on JJF's history and preceding offenses. Dr. Kern thought significant that JJF reoffended while on parole after his 1992 release from prison. This showed "he had some kind of treatment that was apparently totally ineffective on an outpatient basis." Dr. Kern said, "I think he requires intense treatment on an inpatient basis." JJF also scored an eight on both the Minnesota Sex Offender Screening Tool Revised (MnSOST-R) and Static-99, indicating a high risk to reoffend.
The Deputy Attorney General presented Dr. Kern with a document indicating that, upon JJF's release in January 1992, JJF agreed to contact the therapy center if he felt the need for support or other therapeutic services. Dr. Kern testified he did not see any evidence JJF ever tried to contact the help center during that period. To Dr. Kern, this showed JJF was not going to do anything to control his impulses or to seek help and avoid another offense.
Like Dr. Kern, Dr. Singer believed there was a substantial risk JJF would reoffend. Dr. Singer examined JJF on May 7, 2002. He reviewed various psychological tests performed on JJF, including an intellectual assessment (ADCT), objective personality test (MMPI-2), and psychosexual assessment (MSI-II). He also evaluated JJF's results on various risk assessments, including the Static-99 and Sexual Violence Risk-20 (SVR-20).
Dr. Singer concluded JJF had paraphilia. He observed "a substantial compulsive quality" to JJF's actions. He particularly noted JJF had an antisocial personality disorder that is "severe, recalcitrant, and debilitating." Dr. Singer testified JJF presents "one of the strongest anti-social personality disorders I've ever seen." "And," he said, "that type of character structure makes it easy to violate the rights of others. Rejects society's norms. And what's particularly poignant here is that throughout [JJF's] life there really has never been any demonstrable results that he's . . . ever changed."
Dr. Singer concluded JJF posed a moderate to significant level of risk for sexual offense recidivism and required specialized sex offender-specific therapy. He recommended JJF's commitment.
JJF presented himself as the sole witness at the final hearing. He admitted to committing the various sex offenses that led to his imprisonment. He said he did not have any current sexual urges or fantasies *926 involving children, or any current deviant desires, and said he was impotent.
JJF said he had no desires to reoffend, but "just want[s] to be myself, and ... live the rest of my life out as an ordinary citizen, to have people proud of me." He claimed he had no problems complying with prison rules, and denied exhibiting impulsive behavior in prison. He said the fear of dying in prison would give him motivation to avoid future problems.
After the completion of testimony on June 11, 2002 Judge Freedman ordered the commitment of JJF. He found the State proved that JJF: (1) was convicted of a sexually violent offense, (2) suffers from a mental abnormality or personality disorder, and (3) by clear and convincing evidence, is likely to engage in acts of sexual violence if not confined in a secure facility. N.J.S.A. 30:4-27.26. Judge Freedman was "satisfied that faced with the issue of ... what would happen on final release today, I think [JJF] clearly meets the criteria of the [SVPA]...." Judge Freedman observed,
[JJF] has done criminal acts, which are related, although not specifically sexually violent offenses under the statutory definition, are clearly related to those kinds of offenses, are a step towards them, and that given the opportunity I think, there's no question in my mind, he would ... engage in them again, because he does not have any idea of why he does it, what causes him to do it, what causes him at ... the age of 50 to start doing it, and I think that's what makes him extremely dangerous.
So I think that he does meet the criteria, and he has a substantial inability to control his behavior as is shown by his record, and he needs at least some treatment here before he can be considered for release, so he can get some idea and some grasp on the reasons behind what he does.
Judge Freedman set a review hearing date of December 4, 2002.
On July 26, 2002 JJF filed a notice of appeal, which gave rise to Appeal-1. On November 18, 2002 we granted JJF's request for a temporary remand in light of the Supreme Court's decision in In re Commitment of W.Z., 173 N.J. 109, 129-30, 801 A.2d 205 (2002) (holding that an individual who has committed a sexual offense poses a threat to the health and safety of others if found, by clear and convincing evidence, to have serious difficulty in controlling harmful sexually violent behavior such that it is highly likely that the individual will reoffend).
Before the remand hearing was held, another review hearing was scheduled for December 6, 2002. Judge Freedman believed the December 6, 2002 review hearing mooted the reconsideration of the initial hearing on remand, but he did not want to "create unnecessary issues for the Appellate Court" so he heard both the initial decision, now on remand, and the review hearing.
The hearing took place on December 6, 2002 and continued on January 16, 2003. As to the initial commitment on remand, he quoted various observations he made at the initial hearing on June 11, including his opinion that there existed "clear evidence back in `85 and in `93 of a serious inability to control behavior." Judge Freedman cited his earlier opinions that JJF "has very little, if any, understanding of why he did what he did, virtually none," and that there was no question JJF had a propensity and a compulsivity to do what he did.
Judge Freedman concluded,
So I think that he does meet the criteria and he has a substantial inability to control his behavior. And as I indicated *927 before, that substantial inability really equates to a high likelihood and ... I don't have any question that he met the standards of W.Z. and in [Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) ] at the time of the last hearing and he does so now.
On March 25, 2003 Judge Perretti issued an order memorializing Judge Freedman's oral opinion of January 16 concerning the remand. She wrote,
The evidence presented by the State of New Jersey at the commitment hearing which was the subject of [Appeal-1] established by clear and convincing evidence that [JJF] had substantial difficulty in controlling his sexual behavior and that he was highly likely to engage in acts of sexual violence if not committed at the time of the commitment hearing in question. For reason[s] set on the Record before Judge Freedman on January 16, 2003.
On April 3, 2003 JJF filed an appeal of Judge Perretti's order of March 25. This appeal became Appeal-3.
In addition to deciding the issue on remand, Judge Freedman also took testimony pertaining to the most recent review in January 2003. The only witness to appear for either side was the State's Dr. Kern. Dr. Kern completed a report reviewing JJF's progress since Judge Freedman issued the initial commitment order on June 11, 2002.
In his report summary and recommendations, Dr. Kern said:
[JJF] has been charged with several sexual offenses and was convicted of three sexual offenses involving a number of victims. In addition, he has a long criminal history involving non-sexual offenses. His group notes indicate that he was defensive initially, but he has discussed his offenses and generally has been active and attentive in his group sessions. In his interview with me he tried to minimize his offenses and, to some degree, justify his behavior. A discussion with one of his therapists ... revealed that [JJF] does not believe that he should be in STU because he "does not have deviant arousal; only did it once and then he was coming out of prison and was lonely." In his mind, going out in his backyard naked was "just stupid and had nothing to do with sexual offending." In treatment he tends to be defiant. He is invested in treatment to get out and not to improve or get better.
It is my opinion that [JJF] has a disorder which causes him to have serious difficulty in controlling his harmful behavior such that it is highly likely that he will not control his sexually violent behavior and will reoffend, thus meeting the standard of being classified as a Sexually Violent Predator (N.J.S.A. 30:4-27). Therefore, he required continued confinement for care, custody and treatment. It is my opinion that his disorder affects his cognitive, emotional and volitional functions. I hold these opinions to within a reasonable degree of medical certainty.
On January 16, 2003 Judge Freedman explained why JJF's commitment should continue for purpose of the review hearing. Progress notes made by STU psychologists while observing JJF in group therapy indicating minimal participation. Judge Freedman said the submitted exhibits showed a substantially worse picture of JJF's offenses compared to JJF's portrayal of his offenses during group therapy. Judge Freedman mentioned that JJF bought an $850 Yamaha bike for one of his 1985 victims, a boy, age thirteen. Judge Freedman reviewed Dr. Kern's testimony *928 that JJF appears more concerned about leaving STU than improving himself.
Judge Freedman concluded:
I am satisfied after all of the evidence that I have reviewed, as I indicated, by... clear and convincing evidence, that [JJF] does suffer from a mental abnormality and a personality disorder.... His antisocial personality disorder, undoubtedly, is not strong as it was, but it clearly still exists.
...
I think it's clear from the testimony of the experts in the record that he is clearly disposed, without any question, to engage in acts involving young boys. That he has a very substantial inability to control his behavior. That he has no idea what motivates him. The testing shows he's not motivated to treatment. I think my review of the record shows he's not motivated for treatment here. That I think the nature of ... what he tends to do, contrary to the argument of counsel, is serious. Does have a substantial and deleterious effect on children. Creates a substantial danger to the health and safety of children in the community. And that he has a wide repertoire, as Dr. Singer, pointed out, of various things that he does.
Here he does, after a long life of crime, committed these offenses, had some sex offender treatment, got himself a good job, was accepted on the job, was livingworked there lengthy hours, making money, had is own place, and basically, his antisocial personality disorder has ... been tampered down by time and what does he do. Gets himself right back into it, because he can't control what he does. And doesn't know why he does it and that's what makes him dangerous.
And that's what makes me come to the conclusion that if he were released, he would be highly likely, within the reasonably foreseeable future ... to do similar things again. So for those ... reasons, I will continue his commitment.
Judge Freedman set the next review hearing date for November 19, 2003. This hearing awaits our opinion on this appeal.
On February 3, 2003 JJF appealed Judge Freedman's decision to continue his commitment. This appeal became Appeal-2. On May 14, 2003 Appeal-1, Appeal-2 and Appeal-3 were consolidated. To summarize, Appeal-1, filed July 26, 2002 is an appeal of Judge Freedman's decision to commit JJF after the final hearing of April 16 and June 11, 2002. Appeal-3, filed April 3, 2003 is an appeal of Judge Perretti's decision on temporary remand that the April-June 2002 final hearing disposition was proper. Appeal-2, filed February 3, 2003 is an appeal of Judge Freedman's January 16, 2003 review hearing decision that JJF remain committed.

III
The appellant presents two issues on this appeal. He asserts:
POINT ITHE TRIAL COURT ERRED AS A MATTER OF LAW IN NOT CONSIDERING OR GRANTING CONDITIONAL RELEASE WHERE THE STATE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT JJF WOULD BE SUBSTANTIALLY LIKELY TO COMMIT A SEXUALLY VIOLENT OFFENSE IN THE REASONABLY FORESEEABLE FUTURE IF HE WERE SO DISCHARGED.
POINT IITHE TRIAL COURT VIOLATED JJF'S RIGHT TO DUE PROCESS IN REPEATEDLY INTERRUPTING COUNSEL, INTERJECTING ITS OWN OPINION IN PLACE OF WITNESSES, HARSHLY *929 ADDRESSING JJF, AND GENERALLY EXHIBITING BIAS TOWARD THE COMMITTEE.
We have no doubt that the evidence in this case was sufficient to meet the "highly likely" to reoffend standard expressed in W.Z. But the thrust of JJF's appeal is directed towards the right to a conditional discharge.
JJF claims Judge Freedman "erred as a matter of law" because he refused to consider conditional discharge as a possible disposition for JJF. JJF's counsel argues this refusal led to a second error, namely the failure to order such a discharge. JJF says Judge Freedman should have looked at certain variable factors in determining the likelihood of recidivism under the third prong, highly likely to reoffend, particularly the availability of a conditional release plan and the "obvious sincerity and keen motivation expressed by JJF to submit to any condition and participate in any structured supervision in order to avoid reoffense and so that he would not die in a prison setting."
In JJF's testimony at his initial commitment hearing, JJF asked for consideration for a conditional release. In his initial finding on June 11, 2002 the judge found that "it's more likely than not that [JJF] would engage in acts of sexual violence if he were released now without anywithout any conditions of any kind." (emphasis added.) The judge did not consider a conditional release in any of the proceedings.
JJF states, "The State could not and did not argue that it had met the standard of proof of the substantial likelihood of recidivism if JJF were discharged subject to appropriate conditions." Counsel says if Judge Freedman considered conditional discharge, he should have ordered conditional discharge because "the State utterly failed to prove by clear and convincing evidence that JJF would pose a substantial likelihood to reoffend in the reasonably foreseeable future if he were to be discharged with a careful and substantial conditional release."
JJF mainly relies on In re Civil Commitment of E.D., 353 N.J.Super. 450, 803 A. 2d 166 (App.Div.2002), to support his claim that Judge Freedman erred by not considering conditional discharge. JJF misunderstands E.D. At issue there was whether, once a person no longer meets the SVPA "sexually violent predator" criteria, a judge can order conditional discharge. The issue arose because of the language in one section of the SVPA, N.J.S.A. 30:4-27.32c(1), which states:
If the Department of Human Services recommends conditional discharge of the person and the court finds that the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment as a sexually violent predator unnecessary for that person, the court may order that the person be conditionally discharged in accordance with such plan.
[N.J.S.A. 30:4-27.32c(1) ]
In E.D., we said that where a person no longer satisfies the criteria for a "sexually violent predator," the court, not only the Department of Human Services, may order conditional discharge as a matter of its inherent authority. 353 N.J.Super. at 453, 803 A.2d 166. We said, "Here, although the SVPA says that when the committee is no longer found to be a sexually violent predator he should be released, the statute does not state that the release must be without conditions." Id. at 456, 803 A.2d 166. We ruled that the ability of a judge to order conditional discharge, once the *930 court determined the person no longer meets the SVPA criteria as a sexually violent predator, is necessary to effectuate the SVPA's purposes in ensuring public safety and security. Id.
Contrary to JJF's contentions, the E.D. court certainly did not suggest that a judge should conditionally discharge a person deemed a sexually violent predator under the SVPA. Under E.D., if the person is a sexually violent predator, conditional discharge is not an option. Only if the person is no longer likely a sexually violent predator may the judge consider conditional discharge under E.D.
Our deeper consideration of E.D. confirms this position. At the conclusion of E.D. we addressed the committee's argument about the applicability of two unpublished decisions, In re Commitment of S.R., No. A-923-00 (App.Div. February 6, 2000), and In re Commitment of R.W., No. A-1230-00 (App.Div. January 30, 2002). We described these cases as raising the question whether "the court has the authority to order that a sexually violent predator be placed in a facility less restrictive than the [STU]." E.D., 353 N.J.Super. at 457, 803 A.2d 166.
In those cases, we considered the plain language of N.J.S.A. 30:4-27.32(a), which requires that sexually violent predators are housed in a "facility designated for [their] custody, care and treatment" by the Department of Corrections. We ruled that the trial judge "had no authority to place the offenders in a less restrictive facility." E.D., 353 N.J.Super. at 458, 803 A.2d 166. These rulings show our general disapproval of a trial judge putting a committed sexually violent predator in a correctional facility, or any less restrictive environment, other than the STU.
Judge Freedman acted in a manner entirely consistent with E.D. when he did not consider conditional discharge as an option for JJF on this record. Because Judge Freedman was under no obligation to consider conditional discharge for an individual he deemed a sexually violent predator, JJF's next argument, that the judge erred when he did not order conditional discharge, lacks merit.
At the review hearing, Judge Freedman proceeded with the sexually violent predator analysis and found the criteria were met.[1] He found JJF continued to have a mental abnormality or personality disorder such that he was highly likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment. Judge Freedman's application of the "highly likely" standard was consistent with the Supreme Court's explanation in W.Z. that
One's likelihood to commit such acts obviously relates to the control determination that the trial court must make. Although the "likelihood" requirement is not defined further in the Act, we import into that analysis the "serious difficulty" standard. An individual may be considered to pose a threat to the health and safety of others if he or she were found, by clear and convincing evidence, to have serious difficulty in controlling his or her harmful behavior such that it is highly likely that the individual will not *931 control his or her sexually violent behavior and will reoffend.
[W.Z., 173 N.J. at 130, 801 A.2d 205.]
After W.Z., Judge Freedman had to determine whether there is a substantial likelihood JJF would reoffend if released, not whether there is a substantial likelihood JJF would reoffend if placed on conditional release. E.D. does not say otherwise. There, the judge first determined E.D. was not a sexually violent predator, and then approached the issue of conditional release. Our case law does not support JJF's contention that the two analyses are collapsed into one.
In sum, JJF's criticism of what Judge Freedman considered to reach his conclusions does not suggest an abuse of discretion. JJF overlooks Judge Freedman's lengthy discussion of JJF's treatment notes in the months after the final hearing. These notes perhaps best indicated JJF's progress at STU. Ultimately, JJF's position that Judge Freedman lacked clear and convincing evidence for his decision is unpersuasive, especially on behalf of a committee who, unlike the committees in E.D. or W.Z., did not present his own expert. We find no fault with Judge Freedman's conclusion.
However, this does not end the matter. While we affirm JJF's commitment under the SVPA, we conclude that the right must be available to the committed person to demonstrate at any future hearing that he can be released on a conditional discharge with a reasonable likelihood of safety. In E.D., we ruled that the court possesses the inherent power to impose conditions on the release of a committee who is determined no longer a sexually violent predator and who may be released from confinement with a reasonable degree of safety. Here the claim is somewhat different but akin to that in E.D. The appellant's argument is that although JJF meets the criteria for continued commitment if he does not receive and comply with treatment, a properly developed record might possibly support a finding that with appropriate conditions for treatment and with supervision, he does not meet the criteria for commitment. That is, with treatment and a sound conditional release plan, he might not be highly likely to reoffend under the third prong.
We conclude that such conditional release should always be a consideration, if properly documented and supported. This is an extension of E.D. but a logical and necessary one in view of the potential alternative of permanent confinement. The consequences "may be so severe than a [committee] may be confined for the remainder of his or her life." State v. Bellamy, 178 N.J. 127, 139, 835 A.2d 1231 (2003) According to JJF, E.D. requires the judge to consider a conditional release in examining the third element of a sexually violent predator, the degree of danger to the health and safety of the community. We disagree with JJF that E.D. directly stands for this proposition, but we agree with his contention that we should take the next inferential step which E.D. suggests: the trial judge should consider conditions imposed on JJF that would substantially reduce the likelihood of future acts of sexual violence. When the evidence suggests a potential for defeating this third prong under appropriate conditional release terms, we conclude the judge has the authority and the responsibility to consider the conditions, and factor that evidence into a determination of whether the third prong is met.
In E.D., we stated:
To allow a person who has been committed as a sexually violent predator to be released without conditions may, in certain circumstances, place the safety and *932 security of the public at risk. This risk of harm to society may be reduced by the person's mandatory compliance with conditions upon release. For example, if a committee is found no longer "likely to engage in acts of sexual violence" as long as he continues to take medication, it would be folly to release him into the general populace without conditioning his release upon compliance with a required course of medication.
Again, and similarly, under N.J.S.A. 30:4-27.32c(1):
If the Department of Human Services recommends conditional discharge of the person and the court finds that the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community so as to render involuntary commitment as a sexually violent predator unnecessary for that person, the court may order that the person be conditionally discharged in accordance with such plan.
Both E.D. and N.J.S.A. 30:4-27.32c(1) recognize that conditions placed on the released individual can reduce the likelihood that the person will engage in acts of sexual violence, the precise determination that a judge must make under the third element, potential sexual violence. If such conditions substantially reduce the likelihood to a degree that prevents the State from proving by clear and convincing evidence that the individual is highly likely to engage in acts of sexual violence, then the individual is entitled to a conditional discharge.
Commitment laws were enacted to strike a balance between the interest of safety for the individual and the community, and the fundamental liberty interests of the person the State seeks to commit. See N.J.S.A. 30:4-27.1b. The court must not confine an individual indefinitely when the individual with reasonable assurance could live safely in the community with support and supervision. See State v. Carter, 64 N.J. 382, 389, 316 A.2d 449 (1974). Such an approach would deny fundamental fairness to that individual. See State v. Bellamy, 178 N.J. 127, 835 A.2d 1231 (2003) (fundamental fairness requires trial judge to inform criminal defendant that civil commitment is a potential consequence to guilty plea, even though such commitment is not a direct or penal consequence). To attain the balance that the SVPA seeks, the court must consider the entire circumstances of the individual, including conditions imposed on the individual that affect the safety of the community. But, if after a fair chance to produce evidence, a conditional discharge from SVPA confinement cannot be granted without undue risks to society, the judge should continue the commitment until the prospects for release are more optimistic.
In this matter now on appeal JJF presented no expert testimony or other evidence of a discharge plan to the judge. Nor did he present any such offer of proof preserved under R. 1:7-3. See State v. Millett, 272 N.J.Super. 68, 100, 639 A.2d 352 (App.Div.1994). We conclude that the trial judge does not have to reconsider these consolidated commitment matters, but must act consistently with this decision in all future review hearings.

IV
As to appellant's due process claims raised in Point II and in his pro se supplemental brief, they will be addressed at the hearing on remand and do not require our comment in a written opinion at this point. R. 2:11-3(e)(1)(E). We conclude they do not justify reversal.
*933 Affirmed in part; remanded in part with instructions for future hearings.
NOTES
[1] Concerning the propriety of JJF's commitment, we note that, as between the final hearing and the review hearing, JJF's current commitment is based on the review hearing. The final hearing only dealt with JJF's commitment for six months succeeding June 11, 2002. Since that period has long expired, the final hearing is only relevant insofar as Judge Freedman relied on that hearing at the review hearing. Otherwise, it has no bearing on the present appeal. Again, this would imply Appeal-1 and Appeal-3 are moot, since they arose from the final hearing.