# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3211-23

IN THE MATTER OF THE
CIVIL COMMITMENT OF
J.R., SVP-785-15.

_____

Argued October 7, 2025 – Decided November 12, 2025

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. SVP-785-15.

Michael Mangels, Deputy Public Defender, argued the cause for appellant J.R. (Jennifer N. Sellitti, Public Defender, attorney; Michael Mangels, on the brief).

Stephen Slocum, Deputy Attorney General, argued the cause for respondent State of New Jersey (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Stephen Slocum, on the brief).

PER CURIAM

J.R. appeals from the May 8, 2024 Law Division judgment continuing his commitment to the Special Treatment Unit (STU), the secure facility designated for the custody, care, and treatment of sexually violent predators (SVP) pursuant

to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We affirm.

I.

J.R. is a sixty-seven-year-old man who in 1985 violently raped and repeatedly stabbed D.W. after breaking into her home at approximately 1:00 a.m. while armed with a handgun. D.W. was awakened by J.R.'s weight after he climbed on top of her while she slept. J.R. choked D.W. into unconsciousness. When she awoke, he digitally penetrated her vagina against her will, forced her to perform fellatio on him, and vaginally raped her repeatedly, despite her begging him not to. J.R. held D.W. captive in her home for the entire night. During that time, J.R. threatened D.W. and her three- and five-year-old children, who were present and sometimes awake. Before the vaginal rapes, J.R. forced D.W. to make him alcoholic drinks and demanded she put on a dress. J.R. placed his handgun on the counter at one point, making D.W. aware of the weapon.

After J.R. raped D.W., he stabbed her with a knife seventeen times. J.R. lodged the weapon in D.W.'s sternum so deeply he had to put his foot on her chest to pull it out. J.R. told D.W. he was going to watch her die, then left, with $100 he stole from D.W. During the assault, D.W. recognized J.R. as the husband of a woman who had recently babysat her children. She stated his name

2

during the assault. D.W. reported J.R., apparently concerned she had identified him, told her he would come back and kill her and her family even if it took thirty years. J.R. denied making that threat.

After J.R. left her home, D.W. managed to crawl to a telephone and dial 9-1-1. She underwent four hours of emergency surgery at a trauma center.

Police apprehended J.R. walking on a street approximately one mile from the home shortly after the attack. He was in possession of a gun matching the description given by D.W., a bloody knife, a bloody mask, and the stolen $100. He said to an officer, "I know what I did."

A jury convicted J.R. of three counts of aggravated sexual assault, attempted murder, kidnaping, burglary, aggravated assault, and weapons offenses. The court initially sentenced J.R. to a 120-year term of imprisonment, with a sixty-year period of parole ineligibility. The sentence was later reduced to a sixty-year term of imprisonment, with a thirty-year period of parole ineligibility.[1]

---

[1] In 1981, J.R. was charged with following a woman home and raping her at gunpoint. The record does not contain further details about this alleged offense or the reasons the charges were ultimately dismissed. J.R. denies the offense, alternatively asserting the victim was a consensual sexual partner and he was out of state at the time the rape took place.

A-3211-23

J.R. also has a non-sexual criminal history. As a juvenile, he was adjudicated delinquent for stealing a motorcycle, driving without a license, and attempting to elude police. He was also charged with being a runaway and possessing a firearm. As an adult, J.R. was charged in 1984 with carrying a prohibited weapon. That charge was dismissed after J.R. completed pre-trial intervention.

In 2015, as J.R. was approaching release from his custodial sentence, the State filed a petition to civilly commit him under the SVPA. The court granted the petition. J.R. has remained at the STU after regularly scheduled annual review hearings through 2024 when the hearing in this matter took place.

In May 2024, the court held a two-day hearing on the State's petition to continue J.R.'s commitment. The State presented two expert witnesses: psychiatrist Dr. Roxanne Lewin and psychologist Dr. Nafisa Mandani. Both experts were qualified in the subspeciality of risk assessment for SVPs and prepared a written report admitted into evidence. J.R. called as an expert witness psychologist Dr. Dorota Novitskie, who has a subspecialty of risk assessment for SVPs. The court admitted Novitskie's report into evidence.

As part of her evaluation, Lewin met with J.R. for eighty minutes. She also reviewed J.R.'s treatment notes from the STU, which included reports of

other professionals who evaluated J.R. during his commitment. Lewin examined J.R.'s criminal history, both sexual and non-sexual, and the details of his assault of D.W.

Lewin gave J.R. a provisional diagnosis of sexual sadism based, in large part, on the significantly violent nature of his sexual assault of D.W. Lewin explained the diagnosis was provisional because J.R. had only one offense but noted J.R. had disclosed during treatment he was aroused by D.W. being helpless during the assault. J.R. also previously described, but later partially retracted, being aroused by the smell of blood during the assault and by being the cause of D.W.'s extreme distress during the attack.

Lewin also diagnosed J.R. with antisocial personality disorder and opined he has "significant criminogenic tendencies," which have existed since his youth. J.R.'s violent tendencies were evidenced by statements he made during therapy about his frustration with another STU resident who made noise outside his cell. J.R. stated he fantasized about stabbing the resident and dropping him in a hole, pouring gasoline on him, and setting him on fire. Lewin found the remarks concerning given J.R.'s offense history.

Lewin also opined J.R. has a significant substance abuse history involving alcohol, which caused him to lose his job and may have caused marital problems.

5

J.R. admitted to Lewin he drank alcohol and smoked marijuana before assaulting D.W. and, as noted above, forced D.W. to make him alcoholic drinks prior to vaginally raping her. The expert opined J.R.'s substance abuse disorder, if not controlled, can contribute to him reoffending sexually. Since 2017, J.R. has facilitated an Alcoholics Anonymous group at the STU. He has a sponsor and has sponsored other residents over the years. Lewin testified that while J.R.'s efforts at ameliorating his substance abuse are laudable, he must also address his sexual offending cycle to mitigate his serious risk of sexually reoffending if released.

Lewin testified J.R. was improving in his efforts at sex offender treatment, has not been on refusal status, and incurred no disciplinary charges during his incarceration and subsequent commitment. However, Lewin opined that despite many years of sex offender treatment, J.R. continues to avoid addressing his assault of D.W. because doing so, in J.R.'s words, "brings him to a dark place." In addition, when J.R. is compelled to discuss his index offense, he continues to minimize some aspects of his assault of D.W.

For example, J.R. first told Lewin he stabbed D.W. one time. He later said he may have stabbed her three times. He did not admit to having stabbed D.W. seventeen times. According to Lewin, J.R. struggles to make meaningful

connections between the details of his assault of D.W. and his sex offending cycle. He therefore does not understand the dynamics of his future risk to reoffend. Lewin opined that without fully acknowledging his assault of D.W. and understanding the causes of his criminal behavior, including his triggers and risk factors, J.R. will be unable to address the dynamics of his offense cycle and limit the risk of reoffending if released.[2]

Lewin gave J.R. a score of zero on the Static-99 actuarial tool, corresponding to the below average risk group.[3] J.R.'s age provided significant mitigation to his risk of reoffending sexually. Lewin, however, opined the score understates J.R.'s risk of reoffending. On the Stable 2007 tool, which assesses dynamic and potentially changeable factors that contribute to sexual reoffending

---

[2] J.R. has given wildly conflicting accounts of his involvement in the attack of D.W. J.R. has denied any involvement. He also has claimed his second wife stabbed D.W. and he took the knife from her when arriving on scene but was too afraid to call 9-1-1 to assist D.W. On other occasions, J.R. said he could not possibly recall any information about the assault because of the passage of time and could not say for sure whether he was involved in the attack.

[3] "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." In re Civil Commitment of R.F., 217 N.J. 152, 164 n.9 (2014). Our Supreme "Court has explained that actuarial information, including the Static-99, is 'simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA.'" Ibid. (quoting In re Commitment of R.S., 173 N.J. 134, 137 (2002)).

risk, Lewin gave J.R. a score of eleven out of twenty-four. This score corresponds to a moderate level of risk. Finally, on the psychopathic checklist-revised (PCLR) tool, J.R. received a score of 28.4, which reflects a high level of psychopathic personality traits.

Lewin opined that J.R. suffers from a mental abnormality or personality disorder that affects him emotionally, cognitively, or volitionally, so as to predispose him to commit acts of sexual violence in the foreseeable future. Those conditions, Lewin testified, do not spontaneously remit and can be controlled only through successful sex offender treatment. She testified because J.R. has not sufficiently benefited from sex offender therapy, he is highly likely to sexually reoffend if released into the community.

Mandani, a member of the STU's Treatment Progress Review Committee who previously worked as the facilitator for J.R.'s group therapy, reviewed records detailing J.R.'s treatment and progress at the STU, and met with J.R. Mandani testified J.R. has progressed to Phase 3A of treatment, a core phase where a resident does the bulk of treatment work. The phase includes exploration of the resident's offenses, high-risk situations, coping skills, risk mitigation, and other topics.

Mandani opined J.R.'s offense is extraordinary because of the level of impulsiveness he displayed. The expert noted J.R. initially intended to commit a burglary. However, when he saw D.W. in her bed he decided to rape her. Then, over the course of the night, he decided to murder D.W. Mandani also noted J.R.'s decision to prolong the attack for several hours, terrorizing D.W. and extending her fear for herself and her children.

Mandani diagnosed J.R. with provisional sexual sadism disorder, anti-social personality disorder, and substance abuse disorder (alcohol) moderated in a controlled environment. He opined J.R. is at a high risk to reoffend if released into the community. Mandani noted J.R. consistently maintained a fair level of treatment engagement at the STU, but occasionally expressed violent ideation, and has been hesitant in treatment to fully explore his sex offense cycle and the reasons for his violent fantasies.

Mandani addressed physical limitations J.R. has experienced because of his age. While J.R. can no longer achieve an erection, he continues to be mentally aroused when he thinks of women he finds attractive. Mandani testified J.R. remains a risk to sexually reoffend because he is aroused by more than sexual penetration. J.R. has acknowledged he was aroused by the power

9

and control he wielded over D.W., including demanding she make him alcoholic drinks and put on a dress while she was terrified by him.

Mandani scored J.R. at a one on the Static-99 actuarial tool, corresponding to an average risk of sexual reoffending. On the Stable 2007 tool, Mandani gave J.R. a score of six out of twenty-four. This score falls in the moderate level of risk. Finally, on the PCLR tool, Mandani gave J.R. a score of 25, which reflects a high level of psychopathic personality traits.

Mandani opined J.R. suffers from a mental abnormality or personality disorder that affects him emotionally, cognitively, or volitionally, so as to predispose him to commit acts of sexual violence in the foreseeable future. Those conditions, Mandani testified, do not spontaneously remit and can be controlled only through successful sex offender treatment. Because J.R. has not sufficiently benefitted from sex offender therapy, Mandani testified, J.R. is highly likely to sexually reoffend if released into the community.

Novitskie prepared a psychological evaluation of J.R. after meeting with him twice and reviewing his STU treatment records and offense history. Novitskie diagnosed J.R. with anti-social personality disorder and alcohol abuse disorder. She opined the disorders do not spontaneously remit, but can be managed with treatment. Novitskie did not diagnose J.R. with sexual sadism.

A-3211-23

She opined J.R.'s one violent assault was insufficient to support the diagnosis because there was no evidence J.R. fantasized about assaulting D.W. or had engaged in similar behavior or fantasies with other women. In addition, she testified it was inappropriate to give J.R. a provisional diagnosis of sexual sadism that has been in place for more than nine years because a provisional diagnosis is intended to be temporary until it is determined if the diagnosis is accurate.

Novitskie did not complete a Static-99 or Stable evaluation of J.R. She instead used the Risk for Sexual Violence Protocol (RSVP), a structured tool which considers twenty-two empirically supported sexual violence risk factors. Novitskie testified the RSVP is a more accurate assessment tool for a person who has been institutionalized for a long period. According to Novitskie, J.R. is not highly likely to sexually reoffend if released from the STU. In support of this opinion, Novitskie relied in part on the absence of any sexual offense or sexual acting out by J.R. during his incarceration and subsequent confinement at the STU, his consistent participation in alcohol abuse treatment, and family

A-3211-23

members willing to assist him upon release. Novitskie recommended continued sex offender therapy after release as a safety net for J.R.[4]

J.R. also testified. He expressed regret for having assaulted D.W. and described his index offense as senseless. J.R. acknowledged there was no justification for the harm he inflicted on D.W. He stated sex offender therapy and continued sobriety were "everything to [him]" and he had no intention of creating another victim if released.

After the conclusion of the hearing, the court issued an oral decision granting the State's application to continue J.R.'s commitment. The court noted J.R. conceded prong one of the SVPA, i.e., that he was convicted of a sexually violent offense. In addition, the court found it was undisputed J.R. satisfies prong two of the statute, i.e., that he suffers from a mental abnormality or personality disorder predisposing him to commit acts of sexual violence and that his conditions do not spontaneously remit. The court rejected the provisional diagnosis of sexual sadism and found J.R. had antisocial personality disorder.

As to the third element of the SVPA, the court found Lewis's testimony credible and adopted her opinion J.R. was highly likely to reoffend sexually if

---

[4] Novitskie also opined it was inappropriate for Mandani, who was involved in J.R.'s therapy in the past, to evaluate him for the purpose of providing expert testimony at a commitment hearing.

released from the STU. The court adopted Lewin's opinion J.R. has not progressed sufficiently in treatment to fully understand his triggers and sexual offense cycle, which elevates his risk of reoffending if released. In addition, the court found credible Lewin's opinion J.R. minimizes his index offense and continues to harbor violent thoughts, as evidenced by his significantly violent fantasy with respect to another STU resident. The court found Mandani's testimony supports Lewin's opinion regarding the likelihood of J.R. reoffending sexually if released from the STU.

The court discounted some of J.R.'s testimony as self-serving and noted that if sex offender treatment truly was "everything" to J.R. he would have participated more fully in treatment at the STU. In addition, the court found J.R.'s stated goal to not create another victim appeared motivated by his desire not to return to custody and not reflective of the need to protect another person from being harmed.

The court found:

> [J.R.] has made great strides related to his substance abuse issues while at the STU and that is not in question. Moreover, he's also shown great progress in handling his anger, being that he has not had any institutional infractions for the entirety of his institutionalization. However, this [c]ourt is not convinced that [J.R.] does not currently pose a high risk of sexual reoffending. While the [c]ourt acknowledges

13

and both parties agree that no resident of the STU is expected to perform perfectly in treatment, [J.R.], despite having been at the STU for nine years, still only has an elementary understanding of the sexual assault cycle. The treatment team has advised that his discussions of his index offense have been superficial, that he struggles in making the connections between various events and his internal experience.

. . . He has yet to address the violen[t] and sadistic nature of his offense, and his sexual arousal . . . in response to inflicting pain and harm to his victim, nor has he explored his experience of arousal to any sadistic stimuli at other points in his past as well as the present.

The court adopted the State's experts' opinions that J.R. "seems to understand some of the principles he's learned through therapy . . . but he has not yet demonstrated that he is able to integrate those lessons in his own life." The court found J.R.'s reluctance to discuss his assault of D.W. inhibits his ability to "understand why he did it and what triggered him to commit such a heinous and brutal crime." The court also found to be concerning J.R.'s expression of violent thoughts about another resident of the STU and a statement attributed to him in treatment notes that his girlfriend should not live with him if he is released because her defiance of his wishes would endanger her safety.

The court concluded it was

not confident . . . that [J.R.] has developed sufficient relapse prevention skills such that he would not pose a

14

high risk of reoffense because the record is absent of sufficient evidence [J.R.] understands why and how he could have committed such a brutal crime and how he can ensure that he never commits such a crime again in light of his very current anger issues.

So, it is this [c]ourt's decision that [J.R.] remain committed to the STU for another year and have a hearing review date in one year.

A May 8, 2024 judgment memorialized the trial court's decision. This appeal followed.

J.R. makes the following arguments.

THIS COURT SHOULD VACATE THE ORDER BELOW, BECAUSE THE TRIAL COURT FAILED TO ADEQUATELY PROTECT J.R.'S DUE PROCESS RIGHT TO A FAIR HEARING.

A. THE TRIAL COURT COMMITTED LEGAL ERRORS SHIFTING THE FOCUS OF THE HEARING, WHICH PREJUDICED J.R.

1. THE COURT ERRED IN ITS UNDERSTANDING OF J.R.'S ADMISSION THAT THE SECOND PRONG OF THE STATUTE WAS MET.

2. THE TRIAL COURT SUBTLY SHIFTED THE BURDEN OF PROOF TO J.R.

B. THE TRIAL COURT TREATED J.R.'S COUNSEL DIFFERENTLY FROM THE ATTORNEY GENERAL DENYING J.R.'S RIGHT TO A FAIR TRIAL.

15

## C. THE TRIAL COURT DID NOT PERMIT CROSS[-]EXAMINATION INTO RELEVANT AREAS BY J.R.'S COUNSEL.[5]

## II.

The SVPA establishes three requisites for commitment. A person must: (1) have been "convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or . . . charged with a sexually violent offense but found to be incompetent to stand trial"; (2) suffer "from a mental abnormality or personality disorder" predisposing him to commit acts of sexual violence; and (3) as a result be "likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. To secure an order for civil commitment under the SVPA, the State must prove each element of the SVPA by clear and convincing evidence. In re Civil Commitment of E.D., 183 N.J. 536, 552 (2005); N.J.S.A. 30:4-27.32(a).

Once an individual has been committed under the SVPA, a court must conduct an annual review hearing to determine whether the individual will be

---

[5] We obtained these point headings from the body of J.R.'s brief. The table of contents of J.R.'s brief includes some point headings that are not reflective of the contents of the brief. We assume those point headings are typographic errors.

released or remain in treatment. N.J.S.A. 30:4-27.35. The same standard for the initial involuntary commitment of a sex offender under the SVPA applies to the annual review hearing. See In re Civil Commitment of E.D., 353 N.J. Super. 450, 452-53 (App. Div. 2002). "[T]he State must prove by clear and convincing evidence that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly likely that the person will not control his or her sexually violent behavior and will reoffend." In re Commitment of W.Z., 173 N.J. 109, 133-34 (2002); N.J.S.A. 30:4-27.26. During the annual review, the court must focus on the committee's current mental condition and the present danger to commit a sexually violent offense. In re Commitment of P.C., 349 N.J. Super. 569, 582 (App. Div. 2002).

"The scope of appellate review of a commitment determination is extremely narrow. The judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" R.F., 217 N.J. at 174 (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). "[A]n appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The appropriate inquiry is to canvass the significant amount of expert testimony in

the record and determine whether the lower court['s] findings were clearly erroneous." D.C., 146 N.J. at 58-59. As the fact finder, "[a] trial judge is 'not required to accept all or any part of [an] expert opinion[,]'" but may "place[] decisive weight on [the] expert." R.F., 217 N.J. at 156, 174. We undertake our review of the judgment mindful the trial court had the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Id. at 174 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)); see also In re Civil Commitment of M.L.V., 388 N.J. Super. 454, 468 (App. Div. 2006).

We are satisfied the record supports the trial court's conclusion J.R. suffers from antisocial personality disorder. Antisocial personality disorder alone is sufficient to meet the requirements for commitment under the SVPA. See In re Civil Commitment of A.Y., 458 N.J. Super. 147, 167 (App. Div. 2019). Based on credible expert testimony, the judge determined J.R.'s disorder, past behavior, and limited progress in sex offender treatment clearly and convincingly proved he was, at the time of the hearing, highly likely to engage in acts of sexual violence if released from civil commitment. The court's decision, to which we owe the "utmost deference" and may modify only where

there is a clear abuse of discretion, In re J.P., 339 N.J. Super. 443, 459 (App. Div. 2001), was supported by the record.

The State's experts explained the factual bases for their opinions and the correlation of those facts to J.R.'s clinical presentation and likelihood to sexually reoffend. The experts relied on interviews with J.R., the details of his sexually violent assault on D.W., his failure to sufficiently progress in sex offender therapy, and extensive treatment notes to reach their opinions. The court acknowledged J.R.'s progress in sex offender therapy but accepted the opinions of the State's experts that he does not yet sufficiently understand his triggers and offense cycle to employ an effective plan to prevent sexually reoffending if released into the community.

We are not persuaded by J.R.'s arguments he was denied due process during the hearing. We begin with J.R.'s contention the court mischaracterized the nature of his stipulation with respect to prong two of the statute. The court stated J.R. did not dispute he had a mental abnormality or personality disorder that does not spontaneously remit and can only be mitigated by sex offender treatment. J.R. argues, however, he disputed whether his disorder can only be mitigated by treatment. In addition, although the court stated J.R. admitted his

antisocial personality disorder caused him to have serious difficulty controlling his behavior, J.R. argues he disputed that concept.

J.R. concedes that at the hearing his counsel stipulated prong two of the statute had been met. He argues he intended the stipulation to be limited to his diagnosis, confirmed by his own expert, that J.R. had antisocial personality disorder. According to J.R., the court mistakenly interpreted his stipulation too broadly. We reviewed the record and find no error warranting reversal.

The court's decision describes J.R.'s stipulation as a concession his antisocial personality disorder does not spontaneously remit, affects him cognitively, emotionally, or volitionally, and causes him to have serious difficulty controlling his sexually violent behavior. However, the court did not rely on that interpretation of the stipulation to conclude J.R. will remain committed to the STU. Instead, the court analyzed the testimony of J.R.'s expert that it is possible for a sex offender to refrain from committing a new sexual offense without having fully benefitted from sex offender therapy and that J.R. had amply demonstrated his ability to control his antisocial personality disorder were he to be released from confinement.

The court made findings the expert's opinion was not credible and adopted the testimony of the State's experts that J.R. had not advanced sufficiently

through sex offender therapy to fully understand his triggers and sexual offending cycle and was not, therefore, likely to refrain from committing a sexual offense if released from the STU. Despite its description of the scope of J.R.'s stipulation, the court undertook the necessary analysis of the evidence admitted at the hearing before concluding the State had satisfied the three statutory prongs necessary to continue J.R.'s commitment.

Nor do we find merit in J.R.'s argument the trial court subtly shifted the burden of proof in its decision. According to J.R., "rather than being clearly convinced that J.R. will reoffend if released, the [c]ourt instead found it wasn't clearly convinced that he won't reoffend if released." In its decision, the trial court repeatedly and correctly stated the State had the burden of proving by clear and convincing evidence J.R. was highly likely to reoffend sexually if released from commitment. The court applied that standard when it reached its conclusion that the State had established J.R.'s continued commitment was warranted. We detect nothing in the court's decision suggesting it shifted the burden of proof to J.R. to establish he would not reoffend sexually if released.[6]

---

[6] At the outset of its decision the court stated it was considering "the application of [J.R.] for release from a term of civil commitment," which suggests it viewed J.R. as having the burden to prove he should be released. However, the remainder of the court's decision makes clear it correctly applied the burden of

To the extent we have not specifically addressed any of J.R.'s remaining contentions, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

---

proof to the State.  We also are not convinced the court considered the likelihood of J.R. committing any criminal offense, as opposed to the statutorily required sexual offense, when it decided he should remain committed to the STU.  While the court did not use the term "sexually" every time it referred to reoffending, the record establishes the court applied the correct statutory criteria.

A-3211-23